For the reasons assigned, the judgment is affirmed.

---

(45 South. 972.)

No. 16,706.

BOURG v. BROWNELL–DREWS LUMBER CO., Limited.

(Jan. 9, 1908. Rehearing Denied March 16, 1908.)

1. MASTER AND SERVANT — SAFE PLACE TO WORK.

Where a boy 14 years of age is employed in a wood working mill and factory, under an agreement with his father that he is not to work about the engine or dangerous machinery, and he is thereafter charged with a duty that requires him to go on a platform which was built "with the idea * * * that no one would be allowed there except those who were competent and experienced in machinery," which is in immediate juxtaposition to the engine and to the pulleys and belting operated by it, and which is unnecessarily dangerous even for an experienced man, his employer is liable for injury to him, resulting in his death, and would be liable though there had been no understanding with his father as to where he should work.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 178–205.]

2. DEATH—DAMAGES—ELEMENTS OF.

The usufruct which the parent enjoys upon the estate of the minor child does not extend to any estate which the child may acquire by his own labor and industry. Hence the earnings of a minor are not to be considered in a suit brought by the parent to recover damages sustained by him in consequence of the death of his child through the negligence of his employer.

3. SAME.

Whilst the parent, in case of need, has the right to look to the child for support, such right is not an element that can be considered in a suit brought by the parent to recover damages resulting to him from the death of his child through the negligence of his employer, when it does not appear that the parent is in need, or is likely to be in need.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, § 112.]

4. SAME—MENTAL SUFFERING OF PARENT.

Appreciating the fact that the doctrine that one person may recover damages for mental suffering caused by the death through negligence of another should be applied with great circumspection, and should not perhaps be extended beyond the cases to which it has already been applied, this court, nevertheless, finds no sufficient reason for receding from the position heretofore taken that, under our law, the mental suffering and deprivation caused to a parent by the death, through negligence, of his child, is an element which may properly be considered in an action for damages against the party charged with the negligence. And, as such damages are not in their nature susceptible of exact measurement, it ought to be sufficient for their recovery that the jury and the court are satisfied from the evidence that the actual relations between the plaintiff in such suit and the deceased, on account of whose death the suit is brought, were the normal ones which should exist between parent and child.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, § 118.]

(Syllabus by the Court.)

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Albert Campbell Allen, Judge.

Action by Arthur Bourg against the Brownell-Drews Lumber Company, Limited. Judgment for plaintiff, and defendant appeals. Amended and affirmed.

The following is the sketch referred to in the opinion:

SKETCH A.

Charles Leonard Wise and Charles Frank Borah, for appellant. Gordy & Gordy and O'Niell & Alpha, for appellee.

### Statement.

MONROE, J. Plaintiff sues for $21,000 as compensation for damages said to have been sustained by him in consequence of the death of his minor son, which event he alleges was brought about through the breach of contract and negligence of the defendant, by whom the boy was employed. Defendant denies the existence of the alleged contract and the negligence imputed to it, and alleges that the death of the minor was the result of his own imprudence. The material facts, as we find them from the evidence in the record, are as follows, to wit:

In the summer of 1905, when the minor was a little more than 13 years old, he was employed by defendant to do light, odd jobs, such as carrying strips from the rip saw and shavings from the lathe, and cleaning up, generally, about a saw and planing mill and wood-working factory, and he worked in that employment for a few months, when he turned his attention to something else. About the 20th of February, 1906, however (lacking still a month or so of being 14 years of age), he was re-employed by defendant, and shortly afterwards his father, plaintiff herein, who was also in defendant's employ, spoke to the latter's foreman in regard to the work that the boy was to do, and an understanding was reached that he was not to go about the engine or any dangerous machinery, but was to be employed in the "shop," operating the band or jig saw, or learning to operate the lathe. The shop adjoins the engine room, to the rear, and the planing and saw mill departments adjoin it, to the right, while the carpenter shop is in the rear of the "stock room," all, as will appear from the subjoined sketch, A (which, though not drawn according to scale, and not showing measurements with even approximate accuracy, may serve, in a general way, to illustrate the text of this opinion). Prior to the date of the minor's employment, defendant had had trouble with the heating of a journal of the main shaft (indicated on the sketch as "Hot Box"), and with the heating of the "wrist pin" (by which, we understand, is meant the pin connecting the piston with the crank), and had installed a small cold water pipe, equipped with a globe valve, a stiff joint (or swivel), a nozzle, and a faucet (or pet cock), which could be brought to bear upon either of the places mentioned, and made to remain in position and discharge upon the heated metal a stream or spray of water. The heating of the main journal was a matter of frequent occurrence (though defendant's president testifies in effect, and it goes without saying, that the journal ought not to have become heated unless the engine was either badly constructed, neglected, or overloaded), and the resulting wearing out or burning of the brasses produced, at times, the irregularity in the movement of the machinery which is described as "knocking." That being the situation, and the minor being usually at work in the shop only about 15 or 20 feet away, and there being a door or opening between the shop and the engine room, defendant's foreman, Kreisele, made it a part of his (the minor's) duty to attend to the cooling of the journal and wrist pin, by applying the water through the pipe when necessary for that purpose. The platform upon which the pipe was installed was, however, an unsafe place for any one to work in, and particularly so for a boy of 14, since, as he faced the revolving crank and shaft, he was in a cramped space about 20 inches wide, with the cold water pipe and a 4-inch hot exhaust pipe on his left, and a rapidly moving belt on his right. In addition to which the flooring of the platform was usually more or less wet or greasy or both, and if water, either by accident or design, were applied through the pipe to the crank or its connections it

was likely to be thrown back into the face of the person holding the pipe. Again, the belt (indicated on the sketch by the arrow) pulls from the bottom, so that the top works loose, and the belt not unfrequently comes off the pulley; moreover, it rises from the surface of the platform at the pulley to the height of some five or six feet at the point where it enters the shop, and altogether, to a person operating alongside of it, was at the time of the accident an uncertain factor and an element of danger. In fact, speaking of the platform in question, which appears to have been put up for the accommodation of the water pipe, Mr. Brownell, president of the defendant company, says in his testimony that "it was built with the idea that no one would be allowed there except those who were competent and experienced in machinery." On the morning of and shortly before the accident, the boy was standing near the jig saw in the shop when he was spoken to by Columbus Towles, who says that he then had in his hand a small saw about a foot long by possibly half an inch in width. A little later he was spoken to at the same place by a witness named Dracket, who inquired for the foreman, and being told that the latter had gone into the mill left the shop, by the door marked "S" in search of him. Within perhaps a minute and a half (whilst he walked rapidly a distance of 70 or 75 feet) Dracket's attention was attracted by his hearing something fall, and he at once retraced his steps, and found the boy lying dead, or nearly so, on the floor between the steps of the platform and the wall or partition between the engine room and the shop, at the point "X," with the foreman and other employés of the mill standing about him.

Royster, a witness for plaintiff, testifies that on several occasions during the boy's first employment he had heard the foreman tell him to go and turn water on the wrist pin, while the engine was running, and that he had seen him go there in the presence of the foreman. Berger, a witness for plaintiff, testifies that during the boy's second employment he had seen him on the platform cooling the journal or wrist pin on several occasions; that he saw him there three or four days before the accident; that he, then, remarked to the foreman, "I notice that you have the knock out of the engine," and that the foreman replied, "Yes; I have got Sidney to 'tend to it.'" Bernichaux, a witness for plaintiff, testifies that he was on the scene soon after the boy was killed, and before the body had been removed; that he asked the foreman how the accident happened, and that the foreman replied that the boy was cooling the box.

Terrebonne, a witness for plaintiff, testifies that he met the foreman at plaintiff's house upon the evening of the day upon which the accident happened, and asked how the boy got killed, and that the foreman replied that he was "cooling off that hot box, * * * that he turned his back, when he and the boy were on the platform, and the first thing he heard a noise, and he looked around and the boy was in there—in that wheel—and everybody was running, and he could not say to me how he got killed."

Cronier, a witness for plaintiff, testifies that he was at work at the resaw when his attention was attracted by the blowing of the whistle; that he ran to see what was the matter and found the boy lying dead, or nearly so, and the belt (marked with the arrow) off the pulley; that the foreman was then standing near the throttle valve (indicated on the sketch by the letter "V"); that the foreman, after a little, instructed him to put up a railing along the side of the platform, which he proceeded to do; that they observed whilst they were working and looking about to see what happened that the dust had been knocked or rubbed off a part of the inside of the fly wheel, and concluded that it had been done by the boy's body as he was carried around in the wheel; that the foreman found

a saw, such as the witness Towles describes, in or near the pulley (on which the [arrow] belt is geared), and said that the boy was killed fooling around the belt; "he said he struck the belt."

Gus Drews, a member and secretary of the defendant's company, testifies that the safety of the company's employés was entrusted to Kreisele, the foreman, and that he had ample authority in the premises. The foreman denies that he made any such agreement as to the boy's employment as is testified to by the plaintiff; denies that he ever directed the boy to cool the journal or the wrist pin, or knew that he ever went on the platform for that or any other purpose; denies that he made the statements attributed to him by Berger, Bernichaux, and Terrebonne; and, denies that he ordered Cronier, upon the day of the accident, to build the railing; but he admits that he gave such an order on the following day, and that the order was complied with, and it is conceded by all of defendant's witnesses that, with the railing as thus built, a person slipping or stumbling on the platform could not well fall into or on the belt that runs by the side of it.

Apart from the denials referred to, the foreman testifies that the journal had "run hot" about a week before the accident; that he had taken out the box and rescrapped and replaced it, and that thereafter the journal "ran warm" and was "running warm" on the day of the accident; that in the morning before starting the engine he had turned the water on the journal and regulated the flow, and that the wrist pin was not "running hot," and had not been doing so for six months; that just before the accident he was standing in the door of the "carpenter shop," at a distance of 91 feet from the boy, who was then at the jig saw; that he saw Dracket speak to the boy, and, knowing his business and desiring to speak to him, followed in the direction taken by him as he

went out of the shop through the door "S"; that in so doing he passed within 20 feet of the boy, but said nothing to him; that being still in pursuit of Dracket he reached the point "Q," just outside of the shop, when "he heard a noise, and turned around and looked and saw the boy fall on his back on the top of this belt, right here. * * * Q. Whereabouts on that belt did you say the boy's body fell? A. Right about five feet from the belt. Q. Where is that—designate it, Mr. Kreisele? A. Right here by the partition wall between the workshop and the engine room." So that, if we correctly understand the witness, between the moment at which he passed or was passing the boy (say, as he reached the point "A," on the sketch) and the moment at which he reached the point "Q," just outside of the shop, the boy had left the jig saw at which he was working and in some way (the witness being unable to guess, how) had placed himself in such a position that, when the witness reached the point "Q," his (the boy's) body fell or was thrown against the partition which separates the shop from the engine room, from which it would follow that the boy must have left the jig saw as or immediately after the foreman passed him, and must have moved faster than the foreman (who was in pursuit of a rapidly receding object). And yet the foreman propounds the theory that he might have backed into the fly wheel from the outside, and did not, necessarily, fall from the platform.

It seems to us to be significant that it is nowhere suggested that any one (other than the boy) was charged with the duty of seeing to the application of the cold water to the journal or wrist pin. The evidence shows that the boy was badly cut and mangled and breathed but a few moments after the accident; that he was earning 85 cents a day; that his father is a carpenter who earns $2.50 or $3 a day; and that his mother is dead. The jury and the judge a quo, with the coun-

sel in the case, visited the scene of the accident, and there was a verdict and judgment for plaintiff in the sum of $15,000, from which defendant has appealed.

## Opinion.

The jury and the judge in the trial court apparently found no reason, nor do we, for accepting the denials of the defendant's foreman in preference to the affirmative testimony of plaintiff's witnesses (who, with the exception of plaintiff himself, are without interest) to the effect that it had been agreed that the boy should not be employed about the engine, but that he was nevertheless charged by the foreman with the cooling of the journal and the wrist pin, and had performed that duty prior to the accident in the presence of the foreman, occupying in order to do so, what appears to have been the most dangerous position in the engine house. Apart from the testimony tending to show that it had been made his duty, it is improbable that, without instructions, the boy would have selected, as a favorable opportunity for leaving work to which he had been assigned (at the jig saw) and meddling with the engine, the moment when the foreman was passing, but it is highly probable that the foreman, in passing, told the boy to see to the journal, which he admits was "running warm," and was likely at any minute to "run hot," and perhaps went with him on or to the platform; and it is quite clear that the boy at once became involved with the belt and the fly wheel, and was dashed against the platform on the opposite side (with a force which broke the stake by which the platform was supported and disturbed one of the planks) and was then brought back and hurled practically lifeless against the partition which separates the shop from the engine room.

But whether the foreman directed the boy or went with him on the occasion in question or not is immaterial, in view of the fact, which we find established, that it had been made part of the boy's duty to apply the water to the journal and wrist pin and that in order to do so it was necessary to go on the platform, which was built "with the idea * * * that no one would be allowed there except those who were competent and experienced in machinery." The platform, unguarded by the railing, which was put up immediately after the accident, was not a reasonably safe place for any one, but was unnecessarily unsafe, and no warning that defendant could have given to Sidney Bourg, a boy 14 years old, would have excused it for sending him there, even if there had been no understanding with his father upon the subject.

It is contended by the learned counsel for the defendant that the testimony as to the statements or admissions of the foreman made, say, within an hour after the accident, and later in the day, should have been excluded, for the reason that he had no authority to bind the defendant in that way. It is, however, conceded that the foreman was vested with full authority with respect to all matters concerning the safety of the defendant's employés; and it was he, by whom, in this instance the employé was engaged, and under whose orders he performed his work. Quoad the matter at issue, therefore, the foreman was the vice principal. Beyond that, the testimony was admissible as contradicting that of the foreman to the effect that he did not know how the boy met his death; that he had never ordered him to cool the journal or wrist pin; and that the boy had never gone on the platform with his knowledge or approval.

We conclude, upon the whole, that in violation of the understanding with his father and of the dictates of common prudence, the boy was assigned to a duty for which he was not employed; in a position where he ought not to have been placed, though there

had been no understanding upon the subject, which position was unnecessarily dangerous even for an experienced mechanic, and of and from the dangers of which the defendant was bound to take cognizance, and to protect the boy, who, by reason of his youth and inexperience, being unable to protect himself, had the right to rely for such protection upon the superior knowledge of his employer. Burns v. Ruddock Cypress Co., 114 La. 247, 38 South. 157; Gracia v. Furniture Co., 114 La. 371, 38 South. 275; Lindsey v. Tioga Lumber Company, 108 La. 468, 32 South. 464, 92 Am. St. Rep. 384; Carter v. Lumber Company, 113 La. 239, 36 South. 952; Perrin v. Cres. City S. Y. & S. H. Co., 119 La. 83, 43 South. 938.

The question of the quantum of damages to be allowed in cases of this character is always a difficult and delicate one to determine. The plaintiff here seeks to recover solely in his own right, and in fact would have no ground for an action as the heir of his minor son, since the latter died almost immediately, and so far as we can judge from the evidence without suffering.

This is not, therefore, a suit for damages, the recovery of which is authorized by those provisions of the Civil Code to be found under the subtitle, "Of the Damages Resulting from the Inexecution of Obligations" (save as will be mentioned hereafter), but is an action based on so much of article 2315 (under the subtitle "Of Offenses and Quasi Offenses") as provides that, "Every act whatsoever of man that causes damage to another obliges him by whose fault it happened to repair it;" and on so much of paragraph 3, art. 1934 (under the subtitle first above mentioned), as provides that, "In the assessment of damages under this rule" (referring to the rule stated in the first clause of the paragraph, that, in certain cases, the damages resulting from the inexecution of "contracts" may be assessed without calculating altogether on the pecuniary loss or the privation of pecuniary gain to the party), "as well as in the case of offenses, quasi offenses and quasi contracts, much discretion must be left to the judge and jury," etc. In the application of the provisions of the law, thus quoted, to claims for damages for mental suffering, injury to feeling, reputation, etc., the established doctrine is that such damages are to be regarded as actual, rather than exemplary. Byrne & Co. v. Gardner & Co., 33 La. Ann. 6; Deslonde v. O'Hern, 39 La. Ann. 14, 1 South. 286; Johnson v. Levy, 118 La. 452, 43 South. 46, 9 L. R. A. (N. S.) 1020. Generally speaking, however, claims for damages of that kind are personal to the individual affected, and not heritable; that is to say, A. has usually no right of action for the recovery of damages for his mental suffering or for injury to his feelings resulting from wrongs inflicted upon B., no matter what may be the relation of B. to him, nor have the heirs of B. any such right. Thus it would hardly be contended that A. could recover for any mental disturbance that he might suffer by reason of the maiming, the libeling, the assaulting, or the death of his cousin, his uncle, or his brother, and the same rule has been in the past in this state, and elsewhere is now applied to the case of a father, claiming damages for injury to his son. In the case of Black v. Carrollton R. Co., 10 La. Ann. 38, 42 (63 Am. Dec. 586), Mr. Justice Buchanan, as the organ of this court, said:

"We carefully notice the distinction between the immediate sufferer in a railroad accident and a relative of the sufferer, however near may be that relative. * * * It may well be supposed that the mutilation of a healthy and promising boy, the pride of his parents, and the example of his schoolmates, such as the petition describes the plaintiff's son, has excited feelings of the keenest anguish in the breasts of his relatives, and of the most painful sympathy in many who were not endeared to him by ties of kindred. But we do not understand the object of the law to be the punishment of an offending party for having been the cause of an unpleasant emotion in the family and acquaintances of the party offended; and this in the form of a pecuniary compensation to the relative or friend.

thus affected. Were such the law, the consequence of an offense to the offender would be greater or less, in proportion to the larger or smaller circle of friends of him who had been offended."

And Chief Justice Slidell, though dissenting upon other grounds from the views of the majority of the court, said:

"I do not think that the father's mental suffering should be an element in the assessment of damages in his favor. This would be extending, without a sufficient legal ground, the exception to the general rule, that actions for injury to the person are personal." See, also, A. & E. Enc. of Law (2d Ed.) vol. 8, p. 664; 13 Cyc. p. 146.

Since the decision thus quoted was rendered, however, it has been held by this court (in the cases cited supra, and others), as also in other jurisdictions (A. & E. Enc. of Law [2d Ed.] vol. 8, p. 661), that injury to feelings is an element of actual, and not of punitory or vindictive, damages, and it has also been held by this court that the provisions (which have been quoted) of articles 1934 and 2315 of the Civil Code are broad enough to authorize the recovery of damages in certain cases for mental suffering inflicted upon one person by the negligent killing of another. Thus, in Sundmaker v. Yazoo & M. V. R. Co., 106 La. 111, 30 South. 285, the mother brought an action, in her own right and in right of her child, two years old, to recover for the negligent killing of the latter, and was awarded $4,000, though it is evident that there could have been no recovery on the second count. In Le Blanc & Wife v. Sweet et al., 107 La. 355, 31 South. 766, 90 Am. St. Rep. 303, the parents sued for damages resulting from the death of their daughter, a girl of 16 who lost her life through the negligence of the owners of a steamboat upon which she was a passenger, and the court said:

"The daughter whom plaintiffs have lost was an active girl, full of life and spirits, and of great physical vigor, who assisted in the work which was required about their country home, and they might reasonably have expected a continuation of that assistance and of the filial and kindly offices which the deceased, as an affectionate daughter, owed to her parents. The plaintiffs are also entitled to recover the amount which the daughter was entitled to recover at the moment of her death."

And the judgment of the trial court which rejected the claim was reversed, and plaintiffs were awarded $2,500.

In Ortolano et ux. v. Morgan's L. & T. R. & S. Co., 109 La. 902, 33 South. 914, the parents of a child five years old sued in their own right and in right of their child for damages resulting from injuries inflicted upon, and the death of, the child (who was run over by a railroad car), setting up as an element of the damages claimed their own sorrow and the deprivation of the child's society and support, and they recovered $4,000; the court awarding a lump sum, without distinguishing between the grounds of action.

In Buechner v. City, 112 La. 599, 36 South. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455, the parents of a boy nine years old, apparently suing only in their own right, recovered $6,000 for the loss of their child, by drowning, as the consequence of the defective condition of a public bridge.

In Bonnin v. Town of Crowley, 112 La. 1076, 36 South. 842, the father recovered $1,000 (and might, perhaps, have recovered more, had not the answer to the appeal been filed too late), for the loss of a son, almost grown, who was killed by accident in defendant's electric plant.

In Parker v. Crowell & Spencer Co., Ltd., 115 La. 463, 39 South. 445, the father, suing solely in his own right, recovered $5,000 on account of the almost instantaneous killing in a railroad accident of a son, who though a minor was old enough to be engaged as a switchman. The court (inter alia) said:

"Defendant contends that, inasmuch as punitory damages cannot be awarded in a case of this kind, where no malice or recklessness equivalent to malice is charged, and inasmuch as plaintiff avers that his anguish and mental suffering at the loss of his son cannot be compensated for in money, and inasmuch as these are the sole grounds upon which plaintiff claims

damages, the petition discloses no cause of action. We do not concur in that view. The petition, taken as a whole, alleges that, while no amount of money can compensate plaintiff for the loss of his son, yet, that he has suffered greatly, and for that suffering, and also by way of punishment, the defendant should be made to pay him $10,000. * * * Plaintiff asks us to increase the amount of $5,000 allowed by the jury, but we see no reason for disturbing the verdict. The allowance is strictly for the suffering of the plaintiff. This is not a case for punitory damages. * * * And no right of action is set up, as having been inherited from the deceased. * * * The question of the allowance of damages to a parent for his mental suffering from the death of his child was very fully considered by this court in the case of Sundmaker v. Yazoo & M. V. R. R. Co., 106 La. 111, 30 South. 285, on application for rehearing, though the report of the case does not show it, and an amount of $4,000 was allowed. The child, there, was an infant, and had been instantly killed. The closely analogous question of allowing damages for the mental suffering of a mother, who had been deprived of the consolation of attending the dying bedside of her son, was very fully considered in the case of Graham v. Western Union Tel. Co., 109 La. 1069, 34 South. 91. In both of these cases the conclusion was deliberately reached that such an element of damages must be considered under the Code."

In Dobyns v. Yazoo & M. V. R. R. Co., 119 La. 72, 43 South. 934, the widow of a freight conductor, suing in her own right alone recovered $10,000 as damages sustained by her from the negligent killing of her husband, the court saying:

"In assessing the damages, the distress and mental suffering inflicted upon the plaintiff by the deprivation of her husband's companionship are, under our law, elements to be considered."

In the case of Graham v. Western Union Tel. Co., 109 La. 1069, 34 South. 91, the Court of Appeal had reversed a judgment in favor of plaintiff and dismissed the suit, and the matter was brought before this court by writ of review. Chief Justice Nicholls, as the organ of the court, said:

"The damages were claimed because of the mental pain and anguish occasioned by the mother not being able to reach the son, prior to his death."

The cause of action having been the failure of the defendant to deliver a telegram addressed to plaintiff may, perhaps, be said to

have arisen ex contractu, and hence to have fallen within the meaning of Civ. Code, art. 1934, which, as we have seen, expressly provides that, in certain cases so arising, the right to recover damages is not restricted to the pecuniary loss. The court, however, in disposing of the matter, refers to the fact that article 2315 of our Civil Code corresponds to article 1382 of the Code Napoleon, and cites from Dalloz & Vergé the following, as an interpretation of the article last mentioned, to wit:

"Nos. 104, 273. Le chiffre des dommages intérêts dus à la veuve et aux enfants de la victime d'un accident du chemin de fer, doit etre basé, non seulement sur le dommage matériel par eux éprouvé, mais, encore, sur le préjudice moral, résultant de la perte du père de famille, des affections brisées et de la douleur sans que méanmoins la somme soit hors de proportion avec la perte réelle et appréciable à prix d'argent."

Appreciating the fact that the doctrine thus sanctioned should be applied with great circumspection and should not, perhaps, extend beyond cases of the character to which it has thus been already applied, we nevertheless find no sufficient reason for receding from the position so taken—that, under our law, the mental suffering and deprivation caused to a parent by the death, through negligence, of his child, is an element which may properly be considered in an action for damages against the party charged with the negligence. And we may add, in this connection, that, as such damages are not in their nature susceptible of exact measurement, it ought to be sufficient for their recovery that the jury and the court are satisfied from the evidence that the actual relations between the plaintiff in such suit and the deceased on account of whose death the suit is brought were the normal ones which should exist between parents and child or husband and wife. Graham v. Western Union Tel. Co., supra. See, also, Warner v. Clark, 45 La. Ann. 863, 13 South. 203, 21 L. R. A. 502; Billet v. Publishing Co., 107 La. 761, 32 South. 17, 58 L. R. A. 62.

Counsel for the plaintiff, now before the court, say:

"The plaintiff was entitled to the usufruct—the imperfect usufruct, which confers absolute ownership, of his [the minor's] earnings during seven years to come."

But they have fallen into an error. It is true that the parents have the usufruct of the estates of their children during the minority of the latter, subject to the obligations imposed by law upon usufructuaries, and to the further obligation of maintaining and educating the children according to their station in life (Civ. Code, arts. 223, 224); but Civ. Code, art. 226, provides that:

"This usufruct shall not extend to any estate which the children may acquire by their own labor and industry," etc.

So that, as to the earnings of the minor, save as an indication of his capacity to furnish the support which, in case of necessity, the plaintiff would have the right to expect, it cannot be said that plaintiff discloses any interest in them.

The remaining cause of action, as presented by the petition, is based on the provision of Civ. Code, art. 229, to the effect that, "children are bound to maintain their father and mother and other ascendants who are in need," etc. But there has been no attempts to prove that plaintiff is in need, or ever expects to be.

Plaintiff's right of recovery, therefore, rests upon the proposition that he is sorrowing, and will sorrow, for the untimely death of his son, and for the deprivation of his son's society and filial affection, and, exercising the discretion vested in the courts in such cases, we fix the amount to which he is entitled at $5,000.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by reducing the amount thereby awarded to $5,000, and, as amended, affirmed, the plaintiff to pay the costs of the appeal.