176 So.2d 718 (1965)
Marie Louise LEWIS et al.
v.
STATE of Louisiana, through State BOARD OF INSTITUTIONS and State Department of Institutions.
No. 6395.
Court of Appeal of Louisiana, First Circuit.
May 24, 1965.
Rehearing Denied July 1, 1965.
*719 Charles E. McHale, Jr., New Orleans, for appellants.
Jack P. F. Gremillion, Atty. Gen., Baton Rouge, Edward S. Robertson, Asst. Atty. Gen., Frank L. Dobson, Special Counsel, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, LANDRY, BAILES and KEARNEY, JJ.
LANDRY, Judge.
This is a tort action by plaintiff, Edgerson J. Fountain and his estranged wife, Marie Louise Lewis Fountain, for damages for the death of their fifteen year old son, Hosea James Fountain, who died June 25, 1962, as the result of a flogging administered by employees and officers of the State Industrial School for Colored Youths, Scotlandville, Louisiana, to which said institution said deceased youth had been committed by lawful authority. Named defendants are the State of Louisiana, Through the State Board of Institutions and State Department of Institutions (sometimes hereinafter referred to simply as the "State", "defendant" or "appellee"). After trial on the merits, the lower court rejected plaintiffs' demands on the ground the tort was not committed by the State's employees within the scope of their employment as required by the doctrine of respondeat superior to impose vicarious liability upon an employer for his employee's remissions. From the judgment dismissing their respective claims plaintiffs have appealed.
Pursuant to an order emanating from the juvenile court, Orleans Parish, decedent Hosea James Fountain was received at the State Industrial School for Colored Youths, Scotlandville, East Baton Rouge Parish, (sometimes hereinafter referred to simply as the "school" or "institution") on June 20, 1962, for indefinite commitment. Five days subsequently, on June 25, 1962, at approximately 6:00 P.M., he died in the office of Assistant Superintendent George Smith. The record shows that the school in question is a correctional institution designed and intended as a place for confinement, education and rehabilitation of delinquent negro juveniles.
*720 The chain of events which culminated in the youth's death commenced immediately after lunch on the last day of his life when, at about 12:30-1:00 P.M., decedent and other inmates of the institution were in line awaiting afternoon assignments which in some cases meant school work and in others field labor. While awaiting his assignment decedent became involved in a fight with another inmate whereupon Damon Lethermon, a supervisor (known as a "cottage parent"), who was in charge of the detail, took both combatants into a nearby dormitory to administer corporal punishment in the form of a "few licks" with a leather strap. Lethermon first applied the strap to the other lad but after the first lash decedent attempted to flee whereupon Lethermon lurched for and took hold of decedent. A scuffle ensued in which both Lethermon and decedent fell to the floor. After regaining his feet, Fountain told Lethermon, "Hit me in the hand, I got sugar * * *," this being the lad's way of informing Lethermon he was suffering from diabetes. Lethermon, grasping the significance of decedent's remark then hit Fountain on the hand several times with the strap and ordered both boys outside to rejoin the work detail to which they were assigned.
The next incident occurred shortly thereafter when Fountain was on a work detail some distance from the school's main campus, said detail having been assigned the task of loading dirt on trucks with shovels under the supervision of Felton Holiday, Industrial Worker 2. In substance Holiday testified he noted Fountain was not doing his work but was leaning on his shovel and "loafing." Holiday admonished the boy to pitch in and help the others and Fountain's response was one of refusal. The second time Holiday chided decedent the latter reacted by claiming to be ill. On the third and last occasion decedent retorted by striking at Holiday and knocking off the steel construction worker's hat the latter wore. Holiday then struck decedent a blow on the jaw with his open hand at which point decedent picked up a nearby shovel to strike Holiday but other boys in the detail restrained decedent and the incident was over.
At approximately 4:00 P.M. the work detail supervised by Holiday returned to the main campus, and Holiday sent Fountain to get a strap from Lethermon. When decedent returned with the strap, Holiday took decedent into a nearby building which housed the security office and there informed the lad he would receive five or six lashes with the strap. After ordering decedent to bend over, Holiday struck decedent one time with the strap and immediately decedent began to forcibly resist. In the tussle which followed they both fell to the tile floor. Other supervisory personnel outside the building hearing the disturbance created by the fray, rushed inside and separated the antagonists thus ending the fracas.
Immediately following the aforesaid incident, Isaac Jackson and L. C. Johnson, employees of the institution, took decedent to the office of George Smith, Assistant Superintendent. Holiday followed his co-workers to Smith's office and related the details of Fountain's conduct to Smith who, according to Holiday, handed Holiday a strap and ordered Holiday to administer decedent a lashing. Holiday complied by commanding decedent to lie on the floor and then proceeded to strike decedent 25 or 30 times with the strap while decedent lay prone. Holiday then left the office and went home. He did not learn of decedent's death (which occurred subsequently at about 6:00 P.M.) until the next morning when he reported for work.
Damon Lethermon testified he went to Smith's office in the late afternoon and found Smith in the act of whipping decedent with a strap while decedent was lying on the floor. According to Lethermon, Smith stopped the lashing after six or seven strokes and then ordered decedent to do "push-ups" which decedent did for a time and then stopped. At this juncture *721 Smith handed Lethermon the strap and ordered Lethermon to "Tear his tail up." Lethermon interpreted these remarks as Smith's directive to resume the flogging because decedent stopped doing the push-ups as previously ordered by Smith. According to Lethermon he then struck decedent approximately 10 or 15 times with the strap and left the room. He returned shortly thereafter and observed his co-employee, Isaac Jackson, striking Fountain two or three times.
Isaac Jackson testified in essence he was ordered by Smith to whip decedent but administered only two or three lashes with the strap because he had a sore wrist. Thereafter he observed Smith strike decedent two or three times while decedent was standing. Jackson then left at which time the boy was on his feet.
L. C. Johnson, a chauffeur and truck driver, testified he drove Jackson and decedent to Smith's office. After Holiday's subsequent arrival, Fountain's offenses were narrated to Smith following which Smith instructed Holiday to "Give him a little tanning." According to Johnson, Holiday struck the youth several times and the boy began to curse them all. When Smith requested decedent to retract his profanity decedent refused and repeated his prior epithets. Johnson further testified the foregoing circumstances were immediately succeeded by the following exchange between Smith and decedent: "* * * George Smith asked him to take it back and don't say that and the boy repeated it again and George Smith say, `You ain't going to change your words?' and he said, `No,' and he said, `You sent here for correction, you got to learn to obey who over you and do what they say do,' and he say, `I want you to take that word back,' and the boy refused to take it back." Smith then took the strap and personally struck the boy six or seven times while the latter was standing. At this point Johnson left and was unaware of any further punishment inflicted on decedent.
In substance George Smith testified he did not flog decedent, nor order him beaten, nor did any one else whip the youth in his presence. He was steadfast in the statement he did not lay a hand on the boy. Smith stated that when he entered the office to which decedent had been taken, he observed Fountain "had his arm up in his mouth butting his head against the wall." Smith commanded decedent to "stop that foolishness." Holiday then reported to Smith that the boy had struck him and requested permission to "chastise" the lad. Smith noted Holiday had a "knot over his left eye," but he decided to speak to decedent instead of permitting Holiday to whip him. In this regard, Smith testified as follows:
"* * * I talked to him, I guess, a half hour or forty five minutes and then after talking with him I asked him did he understand what I was talking about and he said, `yes, sir' and I said, `Now, to make sure that you understand what I am talking about I want you to repeat this until I tell you to stop "I will not hit Mr. Holiday again," to repeat that and he was standing up there repeating that, I guess he repeated that about thirty minutes at least and I stepped out on the porch and he just continued to repeat that and directly he dropped to the floor. Now, that's what really happened.'"
According to Smith, when decedent fell to the floor, Lethermon went in, looked at the youth and announced he believed the boy was dead. Immediately a nurse was summoned to the scene and she in turn called the coroner. Smith noted no blood on the lad or any other evidence of his having been struck on the face or elsewhere. He also stated the boy never left the office after having once entered.
Dr. Chester A. Williams, Jr., Parish Coroner, testified he received a call at approximately 7:45 P.M., on the date in question and proceeded to the institution where *722 he conducted an examination to determine the approximate hour of decedent's death. Subsequently he removed the body to the parish morgue where he personally performed an autopsy. According to Dr. Williams his examination and autopsy revealed a one hundred thirty-five pound colored male, approximately 68 inches in height. The entire body exhibited extensive markings due to force applied by some blunt instrument, including six severe contusions over the right shoulder and right anterior neck area; five areas over the right side of the face; three in the region of the left shoulder and neck; a severe large contusion with fracture of the left zygoma (a facial bone extending up the left temporal area of the skull); numerous contusions of both arms and legs; contusion of the lips; blood on the lips; an accumulation of blood in the back of the throat; a severe contusion over the right kidney region, and severe contusions over the left lower abdomen. Dr. Williams also noted a healing dressed ulcer on the right medial lower leg which pre-existed the recent trauma decedent had obviously experienced. In addition to the foregoing it was disclosed that decedent sustained a contusion of the brain, contusion of the small intestine, hemorrhage around the right kidney and recent hemorrhages in the parietal and left lower frontal lobes of the brain. The body was found to be unusually dehydrated and an extensive haematoma was noted in the skin of the head at the site of the brain injury.
Dr. Williams attributed the cause of death as the culmination of extended trauma, dehydration and shock which latter cause was an assumption inasmuch as he conceded shock could not be determined after death occurs. Specifically, Dr. Williams assigned the causes of death as contusion of the brain, dehydration, multiple trauma of the body, contusion of the small intestine and right kidney and shock. Dr. Williams observed that decedent received some severe trauma to the right shoulder region. He was also of the opinion the contusion over the left lower abdomen and right kidney area could have been caused by kicks or blows with a fist. Regarding decedent's head injuries, Dr. Williams was of the opinion they were not caused by a slap with the open hand. Asked whether they could have resulted from repeated contact of decedent's head against a wall, he replied in the affirmative but explained that it was most unlikely to have occurred from decedent butting his own head against a wall because he most probably would have lapsed into unconsciousness before trusly producing injury to the extent found.
Lastly, Dr. Williams testified Smith admitted he had "chastised" young Fountain which Dr. Williams interpreted as meaning Smith whipped him.
Although Smith admitted having told Dr. Williams he "chastised" decedent, he explained that the chastisement consisted solely of a verbal reprimand. Our careful examination of the record, however, discloses that the word "chastise" was frequently used by Smith in his testimony in such context and in such manner as to convey the distinct impression he understood the word to connote physical or corporal punishment.
The state's defense is not predicated upon defendant's inherent immunity from liability for the torts of its employees inasmuch as the legislature granted its consent to these actions, which acquiescence operates as a waiver of defendant's immunity from suit as well as liability. See Duree v. State, Through Department of Institutions, La.App., 162 So.2d 201. Appellee concedes the doctrine of respondeat superior applies to torts committed by employees of a sovereign state just as it does to those committed by the employees of a private person, firm or corporation. See Trahan v. State, Through Department of Institutions, La.App., 158 So.2d 417. For cases in which the doctrine has been held applicable to claims for injuries to inmates of penal institutions, see St. Julian v. State, *723 La.App., 82 So.2d 85; Green v. State, Through Department of Institutions, La. App., 91 So.2d 153; Turner v. Peerless Insurance Co., La.App., 110 So.2d 807, and Trahan v. State, Through Department of Institutions supra.
Defendant urges its freedom from liability for the aforesaid tortious conduct of its employees on the ground said servants were not acting within the scope of their employment in administering the several floggings to decedent, because no employee had authority to prescribe or administer corporal punishment to inmates of the school. The state further contends no employee of the institution had authority to prescribe or impose punishment of any nature and that in flogging decedent said employees were acting dehors the scope of their employment in that they proceeded in violation of express rules which prohibited and forbade such conduct. Lastly defendant contends all punishment of inmates is a matter for the Committee on Discipline which is composed of the Superintendent, Assistant Superintendent and other employees and no individual acting on his own is authorized to determine how, when and which disciplinary action shall be taken or imposed with regard to an inmate.
Plaintiffs concede that in order for a master to be responsible for a tort committed by his servant, the act of dereliction must occur within the scope as well as the course of the employment. Godchaux v. Texas & P. Ry. Co., 144 La. 1041, 81 So. 706; Comfort v. Monteleone, La.App., 163 So. 670.
Testifying on behalf of defendant, E. Ratcliffe Anderson, Director of Institutions for the State of Louisiana, stated that five penal and correctional institutions are operated under the direction of defendant board whose authority is limited to institutions of such character. Anderson stated that corporal punishment is not allowed or tolerated by the Department in any of the institutions subject to its jurisdiction. When requested to explain what he meant by "corporal punishment," Mr. Anderson replied: "Well, striking or whipping or beating, except in the case of self defense or attempted escape or for some infraction of the rules where you have to repel one of the inmates." Anderson stated not even a mild spanking is permitted and that this policy was made known to employees by means of handbooks prepared by the staff or warden of each institution. In this regard, Anderson identified a "Handbook for Staff Members", introduced in evidence as the pamphlet or handbook in use at the institution in question. In addition, Anderson stated the question of whippings, spankings and beatings was a matter of regular discussion at monthly meetings of superintendents and institutions at which the Board's policy against corporal punishment was continuously reiterated.
Joseph West, school chaplain, testified he resided on the institution's grounds and had never seen an employee with a strap. He never witnessed a flogging and never received a complaint from an inmate regarding a lashing with a leather strap. Chaplain West expressed the opinion that if there were incidents of widespread floggings at the school he most surely would have known about it. The record, however, indicates past disciplinary action against employees for administering unjustified and unauthorized corporal punishment upon inmates. From this we can only conclude that the fact that the chaplain received no complaints from inmates regarding whippings, establishes that Reverend West was not fully aware of all that transpired at the school and that the inmates of the institution did not confide in him to the extent he assumed.
The Assistant Superintendent, Smith, testified the "Handbook for Staff Members" was available for distribution to employees, all of whom should have seen and been aware of its existence and content. However, Dallas Matthews, Superintendent, testified supplies of the booklet had been exhausted some time previously. None of the *724 employees in question had ever seen the booklet, the pertinent portion of which provides as follows:
"8. Corporal punishment, or the use of undue force on students will not be tolerated. Such action will warrant disciplinary action by the Executive Committee. Suspension until some definite action can be secured will result if corporal punishment is exercised."

We note, however, the qualification of the foregoing provision by the following introductory phrase immediately preceding the enumerated rules:
"Try to follow the following simple rules while you are employed at State Industrial:"
Preceding the foregoing statement the following paragraph appears in the handbook received in evidence herein:
"Punishment is at times necessary, but punishment is never an end in itself and must be used with real understanding to be beneficial. No student should be punished in public nor shall an individual administer corporal punishment at the scene of disturbance. A group of employees shall remove said student from the scene for further consideration and action. Do not attempt to punish a child when you are angry. If you cannot remember this, then State Industrial School for Colored Youths is not the place for you." (Emphasis by the authors.)
In the judgment of this court the foregoing provision completely refutes defendant's contention that punishment was not an individual responsibility of each supervisory employee of the school as well as the arguments that punishment could be authorized only by a Disciplinary Committee and that corporal punishment of an inmate was never authorized under any circumstances except self defense and prevention of escapes. The quoted language states in unmistakable language that "Punishment is at times necessary," and "Do not attempt to punish a child when you are angry." Moreover, the admonition "nor shall an individual administer corporal punishment at the scene of the disturbance" implies authority to impose corporal punishment at some place other than the scene of a disturbance as defendant's employees did in the case at bar. Conceding the announced policy of the Board prohibited corporal punishment of inmates, it is clear the rule was not implemented or enforced except in cases which amounted to brutality or extreme, harsh and unusual corporal punishment. In this connection it appears that on some occasions suspensions were ordered as to employees who inflicted extreme corporal punishment upon inmates but that in other innumerable instances no action was taken when supervisory personnel inflicted what was considered reasonable or ordinary corporal punishment. For example, Lethermon, who had been employed at the institution for approximately fifteen months, testified his superior Assistant Superintendent Smith, told him when he was first employed to use a strap to punish boys. Lethermon frankly admitted having flogged other inmates on orders from Smith.
Holiday, who had worked at the school for five years prior to the incident in question, stated his instructions came from Smith. He acknowledged having whipped other inmates with the same sort of strap used on decedent. In this regard he gave the following testimony:
"Q Now, Mr. Holiday, you say you worked at this place for five years. How did you get your authority to whip boys at that school during this period of time? You said you had whipped other boys there. Where would you get permission or authority to do this or did you take it on your own to do it?
"A Well, what had happened there as I told you, Mr. Smith gave us permission. Now every time, in *725 other words, he said, he had told you what you could whip a boy for, and where to whip him at and what to whip him with. Now, everytime I had whipped a boy I did not go to him and ask him, I felt like when he had given the instructions I didn't need to go to him every time."
Asked if he had authority to whip a child for anything, he replied:
"A Oh, no, he said if a boy was destroying property, that is, tearing up his clothes or maybe the chairs or breakingin other words, destroying property or maybe fight-other boys or he attacked you, you know, I don't recall him saying just for anything, I don't remember him saying that."
In addition, Holiday testified he had no fear of losing his position for whipping an inmate for one of the reasons authorized by Smith. He also stated the degree of flogging administered Fountain did not exceed the extent of such punishment normally inflicted on other inmates for similar infractions.
Isaac Jackson, who had worked for the institution seven years, testified he had on occasion administered whippings to boys but that the last instance of his administering corporal punishment occurred some time prior to decedent's demise. He further stated that during the entire period of is employment no superior ever informed him corporal punishment of inmates was a violation of the rules of the institution.
L. C. Johnson, who had been employed at the school for eight years, testified he had witnessed floggings prior to the incident involving decedent.
Smith, Assistant Superintendent and Chairman of the Disciplinary Committee, testified he had been working at the institution for fourteen years. He admitted he had personally flogged inmates on prior occasions. With regard to the authority of an employee to strike an inmate, Smith gave the following testimony:
"Q Did Damon Lethermon ever come to you while he was working there and while you were assistant superintendent and ask you for permission and general authority to administer punishment to boys when one of these three things took place, that is, fleeing the place, or destroying property or hitting one of the guards?
"A No, sir, he didn't come to me as such. We have discussed such things in staff meetings and people have asked when could you do that and you would just answer those three things, but I mean Lethermon did not come to me direct and ask me as such."
While Smith stoutly maintained corporal punishment was forbidden, it is of the greatest significance that he understood corporal punishment to mean brutality or the administration of a beating in such severity as to break the skin or fracture a bone of the recipient of the scourging. The record contains copies of several letters written by Smith suspending employees for inflicting physical punishment on inmates, but in each case it appears the suspension was ordered because Smith considered the punishment unjustified, excessive, or the manner of its administration objectionable. One such instance involved the striking of a student about the face and eyes with the attending possibility of crippling or disfigurement; another was for brutalizing a student and still another involved the abuse of a child's parents when they made inquiry concerning an alleged beating of their offspring.
Dallas B. Matthews, Superintendent, testified corporal punishment was forbidden under any circumstances. Assuming arguendo, such to be the case, Matthews made no attempt to explain precisely what type *726 of disciplinary action was authorized and permitted as punishment for rules infractions by contumacious inmates.
Defendant attempted to establish that no punishment, corporal or otherwise, was authorized without express and specific authority of the Disciplinary Committee which is alleged to be the sole arbiter in disciplinary matters. In questioning Matthews with regard to this matter, he displayed an obvious unfamiliarity with such an avowed policy and seemed confused as to the difference between disciplining employees and punishing inmates for violating the rules.
Although counsel for the state made no reference to disciplining employees, Smith gave the following answers to questions propounded to him on direct examination:
"Q Given an individual case of a breach of regulations, who would make the final determination of the punishment that was to be meted out, whether it would be deprivation of privileges or lockup or what? Who would make the final determination?
"A That was within the authority and in the hands of the superintendent.
"Q You?
"A Yes, sir.
"Q Did the assistant superintendent have the authority to choose the mode of punishment?
"A Only in the absence of the superintendent that he would take over certain authority, but during the presence ofanything that happens to any employee at the institution would have to be taken up with the superintendent himself, even suspension where the employee themselves supervise or suspend people, the superintendent dismisses the individual, but anything thatsuspension or whatnot is cleared with the superintendent. It is cleared at my desk or we have a conference first."
Suspension and dismissal mentioned by Smith in the above quoted responses are totally irrelevant to the punishment of inmates. On re-direct examination Smith stated:
"Q When Smith was assistant superintendent did he have the authority to mete out or choose modes of punishment for the inmates without consultation with the committee, the disciplinary committee?
"A No, sir, he did not, no one person, not even the superintendent has the authority to do that. We attempted in my time there to run it on a morerun it as a democratic basis, the power of the person, one person with too much authority he may abuse that authority so any decision that we make that is made concerning a child has to be taken up unless it isI will say this, a boy can't go to the show or something like that, I mean a minor something, then that has to be cleared up. In many instances people have taken it for granted that this could be done, but we have re-emphasized that what was to be done about a child has to be cleared with the administration, the person in charge of the institution. He has no authority to take anything for granted."
We believe the foregoing testimony on re-direct casts some doubt on the issue of whether or not the superintendent himself possessed authority to mete out punishment to inmates while the evidence of Smith on direct examination unequivocally states authority to determine the method of punishment rested solely in the hands of the superintendent. The next question put to *727 Matthews on re-direct examination was still on the subject of punishment of inmates; the inquiry and his response were as follows:
"Q What about your authority to mete out punishment or choose a method of punishment?
"A I have always done it with consultation with a group as such. I could not get up, for example, I would not dismiss a man, say if I had a report in on him unless I had an investigation to prove whether this accusation was true or not. You don't do that in a democracy. You simply don't make rash decisions for or against any situation and a man is not guilty until he is proved guilty and so in many instances we have found that accusations have come that were not true and some were possibly true and some, of course, we dealt with them as such."
It appears Matthews was again speaking of dismissal as a means of punishment. As superintendent, Matthews was the ranking official at the institution and had full charge of all its various departments. Smith, as Assistant Superintendent was in control during Matthews' absence. On the day in question, Matthews was absent and it is undisputed Smith was in charge of the institution. We do not, however, consider this circumstance necessarily controlling or determinative of the issue involved herein. It is significant, however, that an employee of Smith's ranking position and length of service should be of the impression that employees were authorized to inflict corporal punishment upon inmates for fighting, striking a supervisor, damaging the institution's property and fleeing or attempting escape. It is also of meaningful importance that Smith's subordinates, some with years of service, shared Smith's aforesaid interpretation of the rules in that they unanimously functioned on the policy that the rules authorized whippings for the mentioned offenses.
Certain attending circumstances, seemingly inconsequential or trivial in themselves, lend support to the conclusion that flogging of insubordinate or troublesome inmates was a routine occurrence at the school. None of the employees considered that the beating administered decedent was brutal, cruel or unusual. No employee directly involved was disturbed about the occurrence of the chastisement either as to manner, extent or degree. After playing his part therein, each proceeded about his other duties, including Holiday whose being struck by decedent precipitated the unfortunate chain of events culminating in Fountain's death.
As previously shown, upon returning from the field detail, Holiday ordered Fountain to get the strap from Lethermon. The inference is clear Holiday knew Lethermon had such an instrument and would deliver it without question which is exactly what Lethermon did insofar as the record shows. When Jackson and Johnson took the youth to Smith's office they obviously knew punishment was in order. Neither was surprised when Smith ordered the flogging and each readily and unhesitatingly complied with Smith's directive to administer the lashing.
We believe the conclusion clear and unescapable that Matthews knew or should have known of the practice of inflicting corporal punishment on inmates. Despite Smith's denials we have not the slightest hesitancy in concluding the evidence overwhelmingly preponderates in favor of the conclusion Smith knew of the practice of whipping inmates and believed such punishment did not contravene the rules, at least when administered for the four basic reasons herein previously noted.
Considering the record shows those in charge of the institution knew or should have known it was the practice of the employees to flog an inmate for striking a *728 supervisor (the offense for which Holiday referred decedent to Smith), the employees engaging in such activity must be considered to have been acting within the scope of their employment. Since the employer knew, or should have known such a method of maintaining discipline was practiced by the employees, if such action contravened the employer's orders, it was incumbent on the employer to enforce its regulations prohibiting such practice rather than impliedly condone the violations of its employees by remaining silent.
We do not mean to suggest the institution through its officers as a general rule or policy condoned or tolerated corporal punishment to the degree and extent inflicted upon decedent. Defendant has established that in similar instances employees were dismissed and that those who participated in the beating administered decedent were requested to resign and did so.
It appears that the prohibited act was a violation of the institution's rules simply as a matter of degree since we have shown it was the policy to administer corporal punishment for striking supervisory personnel. Since the employees were, under the circumstances, permitted to inflict corporal punishment for the offense committed by decedent, the employer is liable under the doctrine of respondeat superior even though the retribution imposed exceeded the degree contemplated or justified by the nature of the infraction committed.
The following principle of law appearing in 57 C.J.S. Verbo Master and Servant § 570, pages 313 and 314, is applicable to the case at bar:
"As determinative of scope of employment. The fact that a servant disobeys the orders or instructions of his master in doing the act complained of is not determinative of whether he acted within the scope of his employment; it is well settled that such act may be within the scope of the servant's employment although in violation of the express instructions or orders of the master. If, however, the act forbidden is outside the class of service which the servant is employed to perform, the doing of the act is outside the scope of employment and no liability attaches to the master unless the rule forbidding the act has been openly, constantly, and habitually violated for such a length of time that the master in the exercise of ordinary care should have been apprised and informed of its nonobservance. The fact that a servant is at a place where he should not be, if he had obeyed his master's orders, is immaterial except as it tends to show a permanent or temporary abandonment of his master's service."
Also apropos the case at bar is the following statement of law found in 35 Am. Jur., Verbo Master and Servant, Section 559, Page 993:
"The courts are generally agreed that an employer may be held accountable for the wrongful act of his employee committed while acting in his employer's business and within the scope of his employment, although he had no knowledge thereof, or had disapproved it, or even expressly forbidden it. Also, as a general rule, an employer is liable for acts of his employee within the scope of the latter's employment notwithstanding such acts are done in violation of rules, orders, or instructions of the employer.
* * * * * *
In short, when it is asserted that the employee acted without the knowledge of the employer and without his approval, or in violation of his orders and instructions, the question of liability, as in other cases, is determined by whether the employee was in fact acting within the scope of his implied or apparent authority. If he was not, the employer is not to be held liable, although a prohibition by the employer may be a factor in determining, in a *729 doubtful case, whether the act of the employee was incidental to the employment so as to be within the scope thereof. If he employs incompetent or untrustworthy agents, he must assume responsibility for the consequences of their lack of capacity or qualification for the service. Where the issue is whether the defendant employer or the injured person was in the better situation to have prevented the damage or injury, it is evident that responsibility rests upon the employer rather than on the victim, the former having had an opportunity to inform himself as to the character and competency of the employee, and the victim having been innocent or ignorant in respect thereof.
"* * *."
In our own jurisprudence an assault and battery committed by a finance company employee while on a mission to collect a dishonored check, has been held within the scope of the employer's business thereby rendering the employer liable in tort under the doctrine of respondeat superior. See Vallier v. Aetna Finance Company, La. App., 152 So.2d 112. In Marie v. Dennis Sheen Transfer, Inc., La.App., 134 So.2d 407, a clerk and checker engaged by a stevedoring firm was permitted to recover from the employer of a truck driver who left his truck and attacked the plaintiff.
The equivalent of the common law doctrine of respondeat superior is found in the provisions of LSA-C.C. Article 2320 which states: "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." (Emphasis supplied by the Court.) In Matthews v. Otis Mfg. Co., 142 La. 88, 76 So. 249, the phrase "in the exercise of the functions in which they are employed" as used in LSA-C.C. Article 2320 was interpreted to be the equivalent of "in the scope of their employment" as the latter phrase is used in relation to the doctrine of respondeat superior.
In Wisemore v. First National Life Ins. Co., 190 La. 1011, 183 So. 247, an insurance agent was permitted recovery from the employer of another agent for slanderous remarks. The Court therein held it was immaterial whether the slanderous words were spoken with the knowledge and approval of the employer of the offending employee, so long as they were uttered within the scope and in the performance of his duties in the course of transacting the employer's business. In the Wisemore case, supra, the Supreme Court cited Williams v. Pullman's Palace Car Co., 40 La.Ann. 87, 3 So. 631, 8 Am.St.Rep. 512, and quoted the following language taken from Gann v. Great Southern Lumber Co., 131 La. 400, 59 So. 830, 832:
"In Philadelphia, etc., R. R. Co. v. Derby, 14 How. 468, 14 L.Ed. 502, it was held that the fact that a collision was caused by disobedience of orders by the locomotive engineer was no defense to an action for an injury in the collision by one who, though paying no fare, was lawfully on another locomotive by invitation of the president of the company. The court said: `The rule of respondeat superior, or that the master shall be civilly liable for the tortious acts of his servant, is one of universal application, whether the act be one of omission or commission, whether negligent, fraudulent, or deceitful. If it be done in the course of his employment, the master is liable; and it makes no difference that the master did not authorize, or even know of, the servant's act or neglect, or even if he disapproved or forbade it, he is equally liable, if the act be done in the course of his servant's employment.'"
See also Bearman v. Southern Bell Telephone & Telegraph Co., 17 La.App. 89, 134 So. 787; Walton v. Louisiana Power & Light Co., La.App., 152 So. 760.
We conclude, therefore, the flogging which contributed to decedent's death was administered by defendant's employees during *730 the course and within the scope of their employment as supervisors at the institution in question inasmuch as said employees were performing their assigned task of maintaining discipline in a manner inferentially if not expressly permitted and authorized, any alleged rules to the contrary notwithstanding.
The law respecting quantum in cases of this nature is correctly summarized in the brief of learned counsel for appellee, as follows:
"The factors to be considered in fixing the amount of an award in a death action include closeness of the ties between the parties and the degree of love and affection (Andrus v. White [La.App.], 107 [101] So.2d 7); the age of the child and station in life of the parents (Brown v. Wade [La.App.], 145 So. 790); probability and degree of future support by the child (Bourg v. Brownell-Drews Lumber Co., 120 La. 1009, 45 So. 972); and intelligence and other factors relating to the type of future life expectable by the child (Silverman v. Travelers Insurance Co. [5 Cir.], 277 F.2d 257)."
Counsel for appellants urges our assessment of damages in the sum of $18,500.00 and $16,500.00 to plaintiffs, Edgerson J. Fountain and Marie Louise Lewis Fountain, respectively, together with an additional $1,081.20 to plaintiff, Edgerson J. Fountain, for funeral expenses. In so contending esteemed counsel cites numerous cases which we shall briefly consider for the purpose of distinguishing them from the case at bar.
In Randall v. Baton Rouge Bus Co., La. App., 114 So.2d 98, parents of two children, aged seven and three, were awarded $12,000.00 damages each for the death of children who died instantly. In the Randall case, it was pointed out that the deceased children were the only issue of plaintiffs' marriage.
Himes v. Avinger, La.App., 85 So.2d 304, affirmed a jury award of $10,000.00 to each parent for the death of a 15 year old son who was an excellent student and whose conduct was in general exemplary and commendable. The lad in question was employed, the major portion of his earnings were being systematically placed in savings in anticipation of his attending college. The evidence disclosed the youth was close to his parents and his death unquestionably caused them immeasurable grief, pain and suffering.
In Brooks v. State Farm Mutual Automobile Ins. Co., La.App., 91 So.2d 403, an award of $7,500.00 was granted each parent for the death of their only sona bright, healthy, normal and affectionate child of six years.
On the other hand, defendant cites numerous cases making awards of substantially smaller amounts in suits by parents for the death of a child. Palmer v. American General Insurance Company, La.App., 126 So.2d 777, awarded $500.00 to the father of a 15 year old girl when it appeared the father and mother were divorced and the father had seen his child only once in her 15-year life.
In Todd v. New Amsterdam Cas. Co., La. App., 52 So.2d 880, judgment in the sum of $3,750.00 to each parent was considered adequate for the death of a three and one-half year old girl. This case, however, loses some of its value as authority, because of the intervening decline of purchasing power of the dollar. The same is true of Joyner v. Williams, La.App., 35 So.2d 812, although the latter authority is of greater interest in that it illustrates the principle of permitting each parent to recover for the death of a child, accordingly as the record reveals his or her particular association and relationship with and affection and attachment to the child. In the Joyner case an award of $2,000.00 to the father of a 16 year old son was reduced to $1,000.00 on the finding the father did not live with the *731 family and contributed nothing to the son's support. In the same case the mother was granted $6,000.00 on the showing the boy lived with her and assisted in the operation of the farm from which the family gained its livelihood.
In the instant case the record discloses decedent was not an only child. He was of less than average intelligence and not in good health. Neither was he a child of exemplary behavior. It suffices to say he had had previous encounters with the juvenile authorities and was committed to the school in question for delinquencies. From the time of his admission to the school, his conduct and reaction was one of more or less open rebellion. Any support which appellants may have anticipated from decedent after his release would be most speculative and quite questionable.
Considering the claim of the mother, we find that she abandoned the family when decedent was approximately 9 years old. Although she was still on friendly terms with the boy's father, she saw decedent only infrequently and apparently displayed no genuine interest in the lad's future welfare. We believe an award of $1,500.00 to her for the pain and suffering experienced by decedent prior to his death and $1,500.00 for the loss of the love and companionship of decedent will adequately compensate her herein.
As to the claim of the father, the record shows the boy resided with his said parent, occupying the same bed. While the father was partially incapacitated by a stroke and exercised only slight control over decedent, it nevertheless appears he possessed a genuine feeling of affection for his son. We believe an award to the father of $1,500.00 for decedent's pain and suffering prior to his death, together with an award of $7,500.00 will adequately compensate said appellant. In addition, the father is entitled to judgment in the sum of $1,081.20 expended incident to decedent's burial.
For the reasons hereinabove set forth, it is hereby ordered. adjudged and decreed that the judgment of the trial court rejecting and dismissing plaintiffs' demands is hereby annulled, reversed and set aside.
It is further ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Marie Louise Lewis Fountain and against defendant, State of Louisiana, Through State Board of Institutions and State Department of Institutions, in the full sum of $3,000.00, together with interest thereon at the rate of Five (5%) per cent per annum from date of judicial demand, until paid.
It is further ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Edgerson J. Fountain, and against defendant, State of Louisiana, Through State Board of Institutions and State Department of Institutions, in the full sum of $10,081.20, together with interest thereon at the rate of Five (5%) per cent per annum from date of judicial demand, until paid, all costs of these proceedings to be paid by defendant, appellee.
Reversed and rendered.