233 So.2d 325 (1970)
Joe TAYLOR
v.
CITY OF BATON ROUGE et al.
No. 7896.
Court of Appeal of Louisiana, First Circuit.
March 9, 1970.
Rehearing Denied April 13, 1970.
Writ Refused June 8, 1970.
*326 John T. Caskey, Jr., Asst. Parish Atty., Baton Rouge, for appellant.
Arthur Cobb, Baton Rouge, for appellees.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
Defendant, City of Baton Rouge (City), appeals the judgment of the lower court awarding plaintiff, Joe Taylor, $15,700.35 damages for personal injuries and related loss and expense sustained and incurred when plaintiff was assaulted and battered by former city policeman, James Nelson Addison, in the course of arresting plaintiff for a traffic violation. Addison was also named defendant but the judgment of the lower court is solely against the City. Presumably, therefore, plaintiff's claim against Addison was rejected. Plaintiff has neither appealed nor answered the appeal taken by the City. We affirm the judgment as rendered.
Appellant makes the following contentions on appeal: (1) The trial court erred in failing to find plaintiff provoked the assault by resisting arrest and therefore *327 may not recover; (2) the trial court erred in not applying the provisions of LSA-R.C.C. Article 2320 which requires that an employer have knowledge of or an opportunity to prevent the injury to render him liable for an employee's tort; (3) alternatively, the trial court erred in holding the City liable for excess use of force by an employee, because if excessive force were used the employee was acting outside the scope of his employment, and, alternatively, the trial court awarded plaintiff excessive damages.
The questions presented, except as hereinafter otherwise noted, are primarily factual. As is to be expected, plaintiff's and defendants' versions of the incidents leading to this lawsuit are in conflict.
Officer Addison testified he had been on active duty in defendant's employ for five months when the incident in question occurred. This service was preceded by a six month training course. At approximately 8:30 P.M., February 4, 1961, he was driving a patrol car in the City of Baton Rouge, accompanied by his fellow officer, Damian Deshotels. Noting a speeding vehicle pass two other automobiles at an intersection on Government Street, Addison began pursuit to arrest the driver for a traffic violation. In Addison's words, when plaintiff's vehicle turned off Government Street, the chase proceeded as follows:
"* * * this car turned south or to the right on St. Rose. This car went one block, it turned east on Jura Street, and went one block. Then this car turned south on Lavinia Street and also went one block. From there it turned east on Oleander Street and it went one block. From there it proceeded, it turned right, or it turned south on Eugene Street and went one block. Then it turned, the car went west on McGrath Street for one block and then it went south on Rittner Street and it stopped at the intersection of Rittner and Olive Streets which is somewhat of a horseshoe there."
Addison continued by stating that plaintiff's car used its headlights only when negotiating turns and at all times drove in excess of the speed limit. The pursuit continued with the patrol car's flashing light in operation and its siren sounding. Ultimately plaintiff stopped his vehicle. Addison then stopped to the rear of plaintiff's car so that the headlights on the patrol car would light the scene. He stated he then proceeded to the driver's side of plaintiff's vehicle holding a flashlight in his left hand and his nightstick under his left arm. Meanwhile, Officer Deshotels approached the vehicle from the passenger side. Addison requested plaintiff's driver's license and thought he smelled alcohol on plaintiff's breath. Several times he asked plaintiff to get out of the car and ultimately plaintiff began to slowly comply. After plaintiff got out, Addison ordered plaintiff to place his hands on the car, spread his feet and stand leaning on the automobile. Plaintiff was slow to comply with these instructions and when Addison moved forward to demonstrate what he wanted plaintiff to do, plaintiff suddenly turned and swung. Addison fended the blow, grabbed his nightstick with his right hand and delivered one blow to the left side of plaintiff's face. Plaintiff then fell forward, struck the side of the car and fell to the ground. Addison then called for an ambulance and requested that superior officers from headquarters be sent to the scene. He denied having struck plaintiff more than once. He conceded plaintiff was not charged with drunken driving and that plaintiff was exonerated of the charge of resisting arrest.
Officer Deshotels corroborated Addison's version of the events which prompted the pursuit and of the chase itself. When the suspect vehicle stopped, he proceeded to the passenger side and ordered the two passengers therein to come out. While in the act of frisking the passengers, he heard a loud discussion between Addison and plaintiff but could not make out any of the conversation. He was proceeding toward *328 the driver's side when he noted plaintiff on the front seat bleeding and crawling toward the open door on the passenger side. He then went back to the passenger side to thwart what he presumed to be an attempt to escape on plaintiff's part. He observed no physical encounter between plaintiff and Addison, neither did he hear Addison request plaintiff to get out of the car.
Plaintiff testified he first became aware of the police pursuit after turning off Government Street and being advised by one of his guest passengers that a police car was behind him. When he stopped, Officer Addison ordered him out of the car in abusive and insulting terms. As plaintiff was exiting from the vehicle, he was struck on the top of the head. He slumped to his knees and while in this position was kicked by the officer. Addison then ordered him to rise and place his hands on the automobile. Plaintiff was in the act of rising when he was struck again and lost consciousness. Plaintiff also testified that up to the time of trial in 1967, he has suffered from headaches and dizziness. For these afflictions, he sought medical aid from three doctors.
Charles Taylor, plaintiff's nephew was a guest passenger in plaintiff's car at the time of the incident. He confirmed plaintiff's version of the circumstances and stated that he and another passenger, Clarence Kirklin, exited from the vehicle on the passenger side when ordered to do so by Officer Deshotels. Taylor heard Addison address plaintiff in abusive, insulting language and saw Addison repeatedly strike plaintiff after plaintiff had placed his hands on the automobile roof as ordered by Addison. He also testified Addison terminated the beating only after Deshotels admonished Addison "don't hit that man no more."
Clarence Kirklin, in essence, corroborated the events as related by plaintiff and Charles Taylor. He testified that after getting out of the car at Deshotel's bidding, he observed Addison strike Taylor as Taylor was getting out of the vehicle. He also stated that he heard two additional blows but did not see them struck.
The trial court found that the officers had cause to effect plaintiff's arrest because of plaintiff's erratic and suspicious behavior. He also found Addison's physical attack on plaintiff was unjustified and unreasonable and amounted to a deliberate assault on plaintiff who offered no physical resistance.
Plaintiff's alleged resistance and Officer Addison's reputed use of excessive and unreasonable force in effecting the arrest are so interrelated we will consider these issues as one. We find as a fact that plaintiff did not resist as alleged by defendant. Assuming, for argument's sake, that plaintiff attempted to flee to avoid arrest for a traffic violation, it nevertheless appears he ultimately halted of his own accord. We discount entirely Officer Addison's testimony that plaintiff struck the first blow thus justifying Addison's resort to force to subdue plaintiff. The testimony of plaintiff, his nephew and other guest passenger is that Addison verbally abused plaintiff and struck without warning or provocation. It appears Officer Deshotels was in a position to see and hear what transpired between plaintiff and Addison. It is significant that although Deshotels heard a loud discussion, nevertheless he could not make out any of the conversation between plaintiff and Addison. We are of the view that had Deshotels observed any physical resistance by plaintiff, he would not have remained silent on this vital issue. We believe it a fair inference from the record that Deshotels could not, in good conscience, confirm Addison's version of the incident. We also reject Addison's testimony that he struck plaintiff only once. The nature and number of plaintiff's wounds, as hereinafter shown, demonstrate beyond doubt that plaintiff was struck repeatedly. We find it extremely improbable that plaintiff's injuries resulted from his falling against the car and then to the ground after having been hit only once by Addison.
*329 We conclude the assault upon plaintiff was unjustified. We also note that such action by an officer, sworn to enforce and uphold the law, must be condemned in forceful terms. We are equally appalled by Officer Deshotels' failure to intercede on plaintiff's behalf until after plaintiff was beaten severely. We point out that it is the duty of every police officer to protect a citizen from an unjustified and unprovoked assault even by a fellow officer.
The liability of an employer for the actions of his employees is set out in LSA-R.C.C. Article 2320, which states:
"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."
Our law is established to the effect that an employer is liable for an assault and battery committed by his employee acting within the scope and during the course of the employer's business. Lewis v. State, Through State Board of Institutions, La.App., 176 So.2d 718 (officers of an institution flogging an inmate); Smith v. Foucha, La.App., 172 So.2d 318 (nightwatchman shooting plaintiff); Vallier v. Aetna Finance, Co., La. App., 152 So.2d 112 (an employee of a finance company using force to collect a check for his employer); Berryman v. International Paper Co., La.App., 139 So.2d 806 (an employee apprehending an alleged burglar).
Appellant maintains liability attaches to the employer under Article 2320, above, only when the employer has knowledge of the employee's intent to assault. Such knowledge, appellant argues, is essential in that without it, the employer would have no opportunity to prevent the act, which factor is an indispensable element of liability according to the last paragraph of Article 2320, above.
It has been repeatedly held that the employer's knowledge of his employee's intent to commit a wrongful act is not indispensable to attachment of the liability provided for pursuant to Article 2320, above. In Berryman, Smith, and Vallier, above, employers were held liable for excessive and unjustified use of force exerted by their employees despite a lack of knowledge of such intent on the employee's part. In Wisemore v. First National Life Ins. Co., 190 La. 1011, 183 So. 247, an employer was held responsible for slanderous remarks made by its agent about another insurance agent. In Wisemore, above, the Supreme Court expressly held it was immaterial whether the slanderous statements were spoken with the employer's knowledge or approval, so long as they were uttered within the scope and in the performance of the employee's duties in the course of transacting the employer's business. The applicable rule is stated in Wisemore, above, as follows:
"In Williams v. Pullman [Palace] Car Co., 40 La.Ann. 87, 3 So. 631, 8 Am. St.Rep. 512, it is said by this Court (page 632):
`The earlier doctrine that, "in general, a master is liable for the fault or negligence of the servant, but not for his willful wrong or trespass," has been greatly modified in modern jurisprudence, which places the test of the master's liability, not in the motives of the servant, or in the character of the wrong, but in the inquiry whether the act done was something which his employment contemplated, and which, if properly and lawfully done, would have been within the scope of his functions.'
*330 "In Gann v. Great Southern Lumber Co., 131 La. 400, 59 So. 830, this Court cited the following case at page 405, 59 So. at page 832:
`In Philadelphia, etc., R. R. Co. v. Derby, 14 How. 468, 14 L.Ed. 502, it was held that the fact that a collision was caused by disobedience of orders by the locomotive engineer was no defense to an action for an injury in the collision by one who, though paying no fare, was lawfully on another locomotive by invitation of the president of the company.
`The court said: "The rule of respondeat superior, or that the master shall be civilly liable for the tortious acts of his servant, is one of universal application, whether the act be one of omission or commission, whether negligent, fraudulent, or deceitful. If it be done in the course of his employment, the master is liable; and it makes no difference that the master did not authorize, or even know of, the servant's act or neglect, or even if he disapproved or forbade it, he is equally liable, if the act be done in the course of his servant's employment."'
"In commenting upon this case, this Court said, in the Gann case:
`The language "in the course of his servant's employment," as thus used, is not to be taken as synonymous with "whilst the servant was employed by him," but refers, as we understand it, to acts done by the servant, however ill judged, in connection with, or in furtherance of, the purposes of his employment.' Pages 405, 406, 59 So. page 832."
Subsequent to Wisemore, above, it was held in Perot v. United States Cas. Co., La. App., 98 So.2d 584, that an employer may be held liable for the acts of his employee, even though the latter causes injury through a violation of the former's instructions.
Appellant mistakenly relies upon Lewis v. State, Through State Board of Institutions, La.App., 176 So.2d 718, as authority for the rule that knowledge by the employer is indispensable to liability in instances of this nature. In Lewis, a state agency was sued for an assault and battery committed by an employee on an inmate of a penal institution. The serious question arose whether the employee was acting within the course and scope of his employment in administering corporal punishment. Knowledge of such action by the employer was considered only insofar as it bore upon the issue of whether the employee in administering such punishment was acting within the scope and during the course of his employment. Lewis, above, quoted at some length language from Wisemore, above, to the effect that knowledge on the employer's part is not indispensable to liability pursuant to Article 2320, above.
Unquestionaby Addison was acting within the scope and during the course of his employment by defendant City. As an officer, it was Addison's duty to arrest persons who violate the law. We judicially note that the use of force in affecting an arrest is not an abnormal police function. Therefore, it may not be said that an officer's use of force is beyond the scope of his employment. Rather, when justified and necessary, force is essential to an officer's proper discharge of his duty to effect an arrest. However, the use of unnecessary, unreasonable or excessive force, renders both the officer and his employer liable for resulting injuries.
Plaintiff was hospitalized from February 4, to February 11, 1961. On admission, plaintiff was attended by Dr. William T. Brown, General Practitioner. Dr. Brown testified that upon examination he found plaintiff's face, head and scalp were bloody, lacerated and swollen. A red exudate, believed to be bloody spinal fluid, was observed dripping from plaintiff's nostrils. This symptom indicated fracture of the frontal bone going through the cribiform *331 plate, which diagnosis was confirmed by X-ray. Plaintiff was also found to have contusions of the face and scalp and several hematomata. In addition, plaintiff sustained a depressed fracture of the left cheekbone, fracture of the maxilla bone above the left eye involving the sinus, and fracture to the tip of the nose. Small lacerations and breaks in the skin were discovered from plaintiff's lips to the crown of his head. Dr. Brown explained that four stitches were required on the crown of plaintiff's head and seven to close the wound to the cheekbone. Two days later plaintiff developed an acute inflammation in the left eye. Dr. Brown also stated that plaintiff suffered from an unusual amount of facial swelling after surgery to correct the depressed cheek fracture. It was Dr. Brown's opinion that it would take three to four weeks for plaintiff's nose to heal and approximately eight weeks for plaintiff to recover from his other injuries. Dr. Brown saw plaintiff in his office on February 15, 1961 and April 15, 1966. On this latter visit the doctor observed that plaintiff still suffered an impairment of ability to raise his left eyelid, which condition was attributed to plaintiff's injuries. At this time, plaintiff complained of tenderness over the left temple which condition Dr. Brown found inexplicable. Headaches complained of by plaintiff were considered consistent with the nature and extent of the injuries sustained.
Dr. Richard W. Hughes, plastic surgeon, attended to plaintiff's fractured cheekbone at Dr. Brown's request. Dr. Hughes saw plaintiff February 5, 1961, and performed the necessary corrective surgery four days later. It was Dr. Hughes' opinion that plaintiff should recover from the surgery performed in about ten days and that with plaintiff's other injuries, plaintiff would be disabled until about April 21, 1961.
Dr. George H. Jones, ophthalmologist, examined plaintiff February 9, 1961, and found traumatic iritis (inflammation) of plaintiff's left eye, which condition was extremely painful but responded well to treatment in two days. He testified the condition would require approximately three weeks to heal.
It is settled that in an action for assault and battery, damages may be recovered for indignity and humiliation, Mancuso v. Treadaway, La.App., 176 So. 2d 731. In assessing damages in tort actions, considerable discretion is vested in the trial court whose awards, in such cases, will not be disturbed unless there appears a clear abuse of such discretion. Wascom v. Varnado, La.App., 209 So.2d 72. We find no abuse of the trial court's discretion in this instance.
The judgment of the trial court is affirmed at appellant's cost.
Affirmed.