295 So.2d 914 (1974)
Jefferson K. JONES and Jefferson Hooper, Plaintiffs-Appellees,
v.
CITY OF LAKE CHARLES, Defendant-Appellant,
Mayor James E. Sudduth and Lieutenant Gerald Patrick, Defendants-Appellees.
No. 4521.
Court of Appeal of Louisiana, Third Circuit.
June 13, 1974.
*915 McHale & Bufkin by Louis D. Bufkin, Lake Charles, for defendant-appellant.
Collings & Collings by R. Wm. Collings, Lake Charles, for plaintiffs-appellees.
Before FRUGÉ, HOOD, DOMENGEAUX, J.
HOOD, Judge.
Jefferson K. Jones and Jefferson Hooper instituted this suit against the City of Lake Charles, James E. Sudduth, mayor of that city, and Lieutenant Gerald Patrick, a member of the city Police Department. They demand judgment against the city and Sudduth for $3,700.00, alleging that that amount is due them under a contract for the repair of a boat. Alternatively, they demand judgment for the same amount against those defendants based on quantum meruit. Plaintiffs also seek to recover from all defendants the additional sum of $15,000.00 as damages for an alleged unlawful assault.
The trial court rendered judgment in favor of plaintiffs and against the City of Lake Charles for $1,030.36, including $530.36 for repairs to the boat based on quantum meruit, and $500.00 as damages for *916 unlawful assault. The demands of plaintiffs against Sudduth and Patrick were rejected. The defendant city appealed, and plaintiffs answered the appeal praying that the amount of the award be increased.
Since plaintiffs have not appealed, the judgment of the trial court rejecting their demands against Sudduth and Patrick has become final, and no question is presented here as to the liability of those two defendants.
The issues are: (1) Did a valid contract exist between plaintiffs and the City of Lake Charles for the repair of a boat? (2) Are plaintiffs entitled to recover on a quantum meruit basis? (3) Is the city liable for damages for unlawful assault? (4) Are the awards excessive or inadequate?
On several occasions in August, 1972, plaintiff Hooper and Mayor Sudduth discussed the condition of a 30-foot, steel hull boat, named "The Spirit of Lake Charles," which vessel at that time was partially submerged in the body of water known as Lake Charles. The diesel engine which formerly powered the boat had been removed and partially disassembled, and it was located in a garage belonging to the city Fire Department.
Shortly after some of the above mentioned discussions took place, plaintiffs Hooper and Jones caused the boat to be pumped out, raised and then towed to property on the lake front which had been leased by the city to the Lake Charles Yacht Club. Plaintiffs then used a bulldozer to pull the boat up on the beach and to turn it on its side. The boat remained at that location for about one month, during which time plaintiffs made repairs to the hull and to the engine. After the repairs to the hull had been completed, plaintiffs returned the boat to the water and installed the repaired engine. They then invited and took Mayor Sudduth for a ride in it. At the conclusion of that boat ride, plaintiffs presented Sudduth with invoices totaling $3,700.00 for repairing the boat. A dispute arose as to whether a contract had been entered into between plaintiffs and the city for the repair of the vessel. Mayor Sudduth nevertheless requested that plaintiffs furnish him with two invoices, one for the repair of the hull and the other for the repair of the engine, so that he could "have them checked."
A few days after these invoices were presented to Sudduth, and while the above mentioned controversy was pending, Sudduth instructed Carlo Lupo, Superintendent of Maintenance for the city, to pick up the boat and take it to a shipyard for inspection. Lupo thereupon went to the Yacht Club, where The Spirit of Lake Charles was moored, to get the boat, and he was accompanied on that mission by Ronald Stowe, Administrative Assistant to the City Department of Public Works, and Lieutenant Gerald Patrick, who was armed and was wearing the uniform and badge of a city policeman. They were transported to that location in a boat belonging to the Calcasieu Parish Sheriff's Department, and piloted by Wayne Bono. Plaintiffs were present at the Yacht Club when these representatives of the city arrived, and plaintiffs objected to the removal of the boat before the amount due them for repairs had been paid. Despite plaintiffs' protests, Lupo, Stowe and Patrick released the lines which secured the boat, and using the Sheriff's boat, they towed it to Olmstead Shipyard, in Lake Charles, where it has remained up to this time.
While the boat was in that shipyard it was inspected by Lupo and by Captain J. B. McIver, a marine surveyor. No part of the amount claimed by plaintiffs has ever been paid. This suit was instituted on September 28, 1972.
Plaintiffs contend that in August, 1972, a valid contract was entered into between Hooper and the City of Lake Charles, represented by Mayor Sudduth, under the terms of which Hooper and Jones, who were partners in that venture, were to repair the boat so that it would float and the *917 engine would run, and in consideration therefor the city would pay plaintiffs the sum of $3,700.00. Mayor Sudduth denies that an agreement to that effect was ever entered into. He concedes that he discussed the subject of repairing the boat with Hooper on several occasions, but he says he told plaintiff that the only way "we could maybe work it out" was to take the boat to the Yacht Club property and turn it on its side so "we could really make an inspection of the bottom and see if there was some way that the bottom could be repaired." He testified that he suggested that Hooper pull the boat on the shore so the hull could be inspected if he wanted to, but that he did not authorize the repairs and did not commit the city to pay anything.
The trial judge concluded that no contract had been entered into between plaintiffs and Mayor Sudduth for repairing the boat, and that the Mayor had not authorized plaintiffs to make any such repairs. We agree with that finding of the trial court, although we feel that plaintiffs were in good faith and that they believed that they had been authorized to do the work.
Plaintiffs allege, alternatively, and in the event it is determined that there was no contract for repairs, that they nevertheless are entitled to recover the sum of $3,700.00 under the doctrine of quantum meruit, quasi contract and unjust enrichment. They contend that they furnished parts and materials for the repair of the hull and engine of the boat, and that they performed a substantial amount of labor in completing those repairs. They argue that they are entitled to be compensated for the labor and materials which they furnished.
The defendant city concedes that plaintiffs made repairs and furnished some materials for the vessel, but it contends that the city received no benefit or value from the services performed by plaintiffs, that the boat is still unseaworthy and incapable of carrying passengers, and that the city thus is not liable to plaintiffs on a quantum meruit basis.
Quantum meruit is an equitable doctrine, based on the concept that no one who benefits by the labor and incidental materials of another should be unjustly enriched thereby. Under those circumstances the law implies a promise to pay a reasonable amount for the labor and materials furnished, even in the absence of a specific contract therefor. LSA-C.C. arts. 1965; 2292-2294; Bordelon Motors, Inc. v. Thompson, 176 So.2d 836 (La.App. 3 Cir. 1965); Lyman v. Richard, 217 So.2d 681 (La.App. 3 Cir. 1969).
The general rule is that the plaintiff who establishes his right to be compensated on quantum meruit should recover as much as he reasonably deserves for his services and for the time and labor required for them. There is no specific test which must be applied to determine the reasonable value of such services. It is a matter of equity depending upon the circumstances of each case. Bordelon Motors, Inc. v. Thompson, supra; Duggan Machine Company v. Consolidated Well Serv. Co., 187 So.2d 124 (La.App. 2 Cir. 1966).
Under contracts with a public body which are void as being malum prohibitum and not fraudulent, the contractor may recover in quantum meruit for the value of the services rendered by him which inured to the benefit of the public body, less the profit and general overhead to which the contractor otherwise might be entitled, provided he sues directly or alternatively under quantum meruit. Corbello v. Jefferson Davis Parish Police Jury, 262 So.2d 151 (La.App. 3 Cir. 1972). We think the contractor also may recover in quantum meruit where no contract of any kind existed, but where the party rendering the service was in good faith, and the public body accepted the work which was performed and derived benefit from it.
*918 Plaintiffs in the instant suit have sued alternatively under quantum meruit. There is nothing immoral about the work performed by plaintiffs, it would not be contrary to public policy for the city to pay for those services, and a contract between plaintiffs and the city for the repair of the boat would not have been prohibited by law. We have already noted that plaintiffs were in good faith. Our conclusion is that if the city derived benefit from the work performed, then plaintiffs are entitled to recover from the city in quantum meruit for the value of services and materials which they furnished for the repair of the boat.
The evidence shows that, after formal advertisement for bids, the City of Lake Charles received sealed bids on May 3, 1972, for the repair of the hull, shaft and rudder, stuffing boxes and toilet pump on the boat. Only one bid was received. It was in the sum of $4,354.48, and the bid was rejected. The work called for in that proposal did not include any engine work. Mayor Sudduth testified that he estimated that it would have cost the city "somewhere in the area of $10,000.00" to repair the hull and engine of the boat. He stated that the city intended to use the boat to carry passengers, primarily for tourist development and conventions, and that before it could be used for that purpose it was necessary that the vessel be put in such condition that it would comply with Coast Guard regulations.
Hooper and Jones worked diligently on this boat for a period of almost one month. They testified that they first raised the sunken hull with the use of pumps and two boats. They then built a ramp of heavy timbers and piling on the shore, rented a bulldozer, and with the use of that bulldozer they pulled the boat out of the water and on the ramp. While it was out of the water they flooded the hull to inspect it for leaks, and after locating and marking the leaks, they drained the hull and proceeded to repair the leaks by welding them. There were eight compartments in the hull, all of which were found to have leaks and which were repaired by welding. A deck cleat which had been torn loose was welded back to the deck. After completing this welding, all compartments were reflooded to determine that the leaks had been repaired. The water was then pumped out, and plaintiffs proceeded to scrape the sides and to paint them. The boat was then put back in the water and was secured to a dock at the Yacht Club.
Plaintiffs then obtained the engine from the Fire Station. They had a "valve job" done on it, reassembled the engine, and installed it in the boat. They built a new pilot wheel, re-routed the control cables and replaced those which had been broken. They furnished and installed in the boat several new instruments which had been lost or destroyed, including a tachometer, an oil pressure gauge, water temperature gauge, amperage meter, an engine shut-off switch, and an alternator. They rebuilt the starter, installed a solenoid switch and provided and installed a new battery. A "rub-rail," consisting of a 4 × 6 inch piece of timber on the side of the boat, was replaced, as was a paddle on the rear paddle wheel and the packing gland on the propeller shaft. Some other repairs were made by plaintiffs, but we think the ones listed above constituted the major repair work done by them.
After the boat had been taken to Olmstead Shipyard, and pursuant to a request of the Mayor, it was inspected by Mr. Lupo, an employee of the city who was qualified as an expert in marine work, and by Capt. J. B. McIver, an expert marine surveyor.
Both of these experts agreed that several of the repairs alleged by plaintiffs had been made. They confirmed the fact that the boat was equipped with a number of necessary instruments and parts, but they were unable to determine whether or not those parts had been supplied or installed by plaintiffs, since they were not aware of the condition of the boat before plaintiffs began repairing it.
*919 Mr. Lupo determined that plaintiffs had welded one patch in the front of the boat to repair a leak, and that the boat has not leaked and has been floating since it was repaired by plaintiffs. He knew that before the repairs were made the engine had been removed from the boat, disassembled and found to have been damaged because water had gotten into it, and he found when he inspected the boat that the engine had been moved from the Fire Station, repaired, reassembled, and installed in the boat. He found nothing wrong with the repairs made to the engine. He testified that plaintiffs had replaced one section of a rub-rail and one board of the false paddle wheel, that they had rewelded the deck cleat, that the new battery and solenoid switch had been put on "recently," and that the boat contained substantially all of the parts which plaintiffs contend they installed on the boat. He stated that he collaborated with Mr. Stowe, and that "we came up with a figure that we think that anything over $1,000.00 I can't see where that much was put on the boat." We interpreted his testimony to be that the repairs performed by plaintiffs had a value of $1,000.00.
Both of the experts who examined the boat for the city concluded, however, that the bottom of the boat had not been properly repaired. Captain McIver stated that the sides of the boat had been cleaned and painted, but that there were two years of growth of barnacles on the bottom which had not been removed, and that it would be impossible for him to "pass the bottom of this boat" unless the barnacles were removed. He testified that in his opinion the boat was "unseaworthy."
The city contends that since the boat is unseaworthy it cannot be used for carrying passengers, that the boat is of no use to the city, and that the city thus derived no benefit from the repairs made by plaintiffs. It takes the position that since it derived no benefit from the repairs, it is not obligated to pay plaintiffs any amount on quantum meruit.
We agree with defendant that the boat is unseaworthy, and that in its present condition it cannot be used by the city for carrying passengers. We believe, however, that the city nevertheless has benefitted from the repairs made by plaintiffs. Before the repairs were begun, the boat was submerged in the lake, there were leaks in the hull which prevented it from floating, the engine had been removed and disassembled, and the city had found that the engine had been damaged by water. Most of the instruments on the boat had been removed or destroyed by vandals, and it is apparent that the boat was of no conceivable use to the city in that condition. After the repairs were completed, the boat was able to float, the engine had been put into running condition, and a number of instruments needed for operating the boat had been replaced. The vessel has remained afloat continuously from the time the repairs were completed until the present time. Although the boat may still be unseaworthy, all that it apparently needs now is some work on the bottom of the hull in order to render it safe for use in carrying passengers. We believe the city has obtained substantial benefit from the work which was done by plaintiffs.
Plaintiffs testified that they did not keep invoices or records of their expenditures because they were under the impression that a contract had been entered into under the terms of which they were to be paid a fixed amount. Some invoices were produced, but plaintiff Jones testified that the expenditures they were able to remember and record amounted to $530.36. The trial judge accepted that figure as the amount of expenditures actually made by plaintiffs, and he awarded them that amount as the compensation due them on a quantum meruit basis. He allowed nothing for the labor which they performed.
We believe that plaintiffs are entitled to recover for the labor which they performed as well as for the expenditures which they made in repairing the hull and motor. We agree that the evidence which *920 they produced is not sufficient to enable the court to compute, with any reasonable certainty, the amount which they should recover. We note, however, that Mr. Lupo, the expert mechanic who inspected the boat for the city, testified that in his opinion the value of the work performed by plaintiffs amounted to $1,000.00. We have decided that the award made to plaintiffs for repairs to the boat should be increased from $530.36 to $1,000.00.
Plaintiffs contend, finally, that they are entitled to recover damages from the city because of the "unlawful assault" committed by Lupo, Stowe and Patrick, as agents of the city, when the boat was seized and removed from the Yacht Club.
The evidence shows that the boat was secured to the dock by a chain and lock, and other lines, when the above mentioned representatives of the city arrived to get it. Plaintiffs were present, and they protested the taking of the boat. Lupo and Patrick told plaintiffs that they were going to take the vessel despite the latters' protests, and Patrick stated that he would use force if it became necessary to do so in order for them to get it. We have already noted that Patrick was in uniform and was carrying a pistol. Stowe and Patrick proceeded to break or cut the chain and untie the lines which secured the boat. They then, with the use of the Sheriff's boat, towed The Spirit of Lake Charles to the Olmstead Shipyard.
The trial judge held that "The evidence shows that Lt. Patrick went to the site where the boat was docked, and took the boat from the possession of the plaintiffs by use of force and threats. Lt. Patrick was acting either directly or indirectly on orders from the Mayor when he seized the boat ... The court finds that the City of Lake Charles resorted to force when it should have resorted to the courts. The resulting assault renders the city liable to the plaintiffs in damages." The trial judge fixed the amount of the damages at $500.00.
An employer is liable for the tortious acts of his employees committed while acting within the scope and course of his employer's business. LSA-C.C. art. 2320; Taylor v. City of Baton Rouge, 233 So.2d 325 (La.App. 1 Cir. 1970). The employer of a police officer is liable for wrongful injury inflicted by that officer while performing his official duty. Bourque v. Lohr, 248 So.2d 901 (La.App. 3 Cir. 1971); Taylor v. City of Baton Rouge, supra; Robertson v. Palmer, 55 So.2d 68 (La.App. 1 Cir. 1952); Britt v. Merritt, 219 La. 333, 53 So.2d 121 (1951).
We agree with the trial court that Lupo, Stowe and Patrick, while performing duties for the city and within the course and scope of their employment, unlawfully used force and threats toward plaintiffs when the boat was taken. It is immaterial whether plaintiffs had a lien on the boat under LSA-R.S. 9:4502, or whether the boat was subject to seizure by plaintiffs on the ground that it was an abandoned vessel or a derelict. The important fact is that plaintiffs were lawfully in possession of the boat, they claimed a legal right to hold it until they received payment for the repairs, and they had an arguable basis for claiming such a right. Under those circumstances, we think the city was obliged to resort to the courts in order to obtain possession of the boat rather than to use force and threats.
In our opinion, the award of $500.00 made by the trial court for damages for this assault is fair and adequate.
For the reasons assigned, the judgment appealed from is amended by increasing the award made to plaintiffs from $1,030.36 to the sum of $1,530.36. In all other respects the judgment appealed from is affirmed. The costs of this appeal are assessed to the defendant, City of Lake Charles.
Amended and affirmed.