McClendon, Judge.
This is a suit brought by the parents of a 16 year old boy who was killed by a bullet fired by a state trooper during a high speed chase. Defendants are the trooper and his employer, Louisiana Department of Public *500 Safety. From an adverse ruling in the trial court, plaintiffs perfected this appeal. We affirm.
The trial court in its excellent written reasons for judgment clearly sets forth the facts, issues and applicable law, as well as the correct conclusions. We therefore adopt its opinion in its entirety:
“The following are the facts surrounding the death of the youth:
“Trooper Odom of the State Police was on routine patrol on 1-20 west of West Monroe at 1:15 A.M., when he detected on his radar a speeding vehicle and started pursuing it, notifying his headquarters.
“The car refused to stop and commenced evasive maneuvers. Despite its efforts, the trooper was able to get close enough to identify the license numbers which he relayed to his headquarters. He was informed that the vehicle was stolen.
“The maneuvers of that car were highly dangerous, including speeding at more than 100 mph, passing cars left and right, preventing Odom from pulling alongside, etc.
“Troop headquarters was kept informed by radio of this pursuit and other troopers began converging in order to assist in the arrest. One of these was Jerry Durham, the defendant.
“Finally, Odom was successful in getting the car stopped on the highway. The occupants refused to get out. As Odom approached the car, with his pistol drawn, the car started up and ran over Odom, throwing him up over the hood and top of the car. Odom, although injured, managed to get back to his car and radioed headquarters what had happened, that he was hurt and to send an ambulance; also that the car was headed east in the west bound lane of 1-20.
“Durham, who was headed west on 1-20, of course, heard all of this on the radio. He saw the car coming toward him and cut across the median to head back east in an effort to get ahead of the car.
“In the meantime Trooper Norris, who was east of this scene, attempted to block the highway, but was unsuccessful as the car went around him on the shoulder.
“Then ensued a high speed chase (100 mph) in an easterly direction in the west bound lane of 1-20 with cars and trucks being forced off the road to avoid collision.
“The car left the highway by cutting across the median to its right and taking the Thomas Road exit.
“By this time the State Police had notified other law enforcement agencies and both Sheriff’s deputies and West Monroe Police were converging on the scene from all directions.
“After leaving 1-20, the chase was entirely on two lane black-top and gravel roads in residential areas at high rates of speed.
“Shortly after they left 1-20, the voice of Odom came on the radio notifying his fellow troopers that the driver of the car should be regarded as highly dangerous.
“To describe the details of the ensuing chase is not necessary except to say that by this time at least six or eight police units were involved.
“During this chase, Durham was the lead police car. He drew his revolver and attempted to shoot the rear of the escaping car, firing all six rounds without any effect on the preceding car. Durham knew that there were other cars behind him, but he didn’t know how many because he was concentrating on his driving. Neither the Sheriff’s cars nor the West Monroe Police cars were on his radio frequency.
“When the car went through the intersection of Smith and Washington Streets, which is a major intersection with a flashing red light, without stopping, it was pursued by two troopers and a Sheriff’s car. The others broke off and proceeded north on Washington Street in an effort to head it off.
“The car turned right at the next intersection onto a gravel road and then right onto the Bethel Church road headed back to Washington Street.
“Durham pulled out his shotgun which was loaded with 00 buckshot and fired twice at the car. As the car turned left to *501 go through the Bethel Church parking lot, Durham fired a third time. As later revealed, this last buckshot hit the car and one hit the driver.
“The car traversed the length of the parking lot — 300-400 ft. — jumped the ditch on the far side of the lot, and came to rest in the ditch on the opposite side of the street.
“The driver, the young son of plaintiffs, was shot in the head. His companion was not hurt.
“The legal question posed is whether under the circumstances Trooper Durham used an unreasonable or excessive amount of force in attempting to arrest young Smith, thereby making him and his employer liable in damages.
“Chief Justice Sanders, in Kyle v. City of New Orleans, 353 So.2d 969, 972 (1977) explained the law applicable:
“ ‘. . Louisiana Code of Criminal Procedure Article 220 provides:
“ ‘A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.’
“ ‘The use of force by law enforcement officers must be tested by the “reasonable force” standard established by this article. The test precludes “clearly inappropriate force.” LSA-C.Cr.P. Art. 220. Official Revision Comment (b).
“ ‘The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result. LSA-C.C. Art. 2320; Picou v. Terrebonne Parish Sheriff’s Office, La. App., 343 So.2d 306 (1977), writ refused La., 345 So.2d 506 (1977); Cheatham v. Lee, La.App., 277 So.2d 513 (1973); Bourque v. Lohr, La.App., 248 So.2d 901 (1971); Taylor v. City of Baton Rouge, La.App., 233 So.2d 325 (1970).
“ ‘Whether the force used is reasonable depends on the totality of the facts and circumstances in each case. A court must evaluate the officer’s actions against those of ordinary, prudent, and reasonable men placed in the same positions as the officers and with the same knowledge as the officers. Picou v. Terrebonne Sheriff's Office, supra; 6 A C.J.S. Assault and Battery § 97, p. 491. The degree of force employed is a factual issue. Picou v. Terrebonne Sheriff’s Office, supra; Castriotta v. Cronvich, La.App., 277 So.2d 744 (1973); Espenan v. Carona, La.App., 179 So. 119 (1938). As such, the trial court’s finding is entitled to great weight. Canter v. Koehring Co., La., 283 So.2d 716 (1973).
“ ‘Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee’s escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment. See Picou v. Terrebonne Parish Sheriff’s Office, supra; Logan v. Swift, La.App., 327 So.2d 168 (1976); Crawford v. Maryland Casualty Co., La.App., 169 So.2d 612 (1964); Restatement (Second) of Torts, Volume 1, § 132, Comment C, p. 237 (1965); Comment, Tort Liability of Law Enforcement Officers; State Remedies, 29 La.L.Rev. 130.’ ”
“First of all, the Court concludes that the defendant, Trooper Durham, had reasonable cause to arrest the deceased. Reasonable cause exists when the facts and circumstances within the arresting officer’s knowledge, and of which he has reasonable trustworthy information, are sufficient to justify an average man of caution in the belief that a felony has been committed.
“Durham was not only witnessing a misdemeanor being committed in his presence, but was reliably informed that the arrestee was driving a stolen car and had attempted to kill, or at least severely injure, *502 a fellow officer in resisting arrest. He could justifiably conclude, therefore, that he also faced the risk of personal injury.
“As further stated in the Kyle case:
“ ‘We recognize that police officers serve and protect the public at great risks to themselves. A felony arrest is often an emergency confrontation, requiring instantaneous, on the spot decisions. Hence, in these situations, police officers are not expected to act with the same clarity of judgment as others in the calm atmosphere of home or office.’ ”
“Under the circumstances herein, the Court feels that it was a reasonable act to try and stop the fleeing car by shooting at its rear.
“In the case of Sauls v. Hutto, 304 F.Supp. 124 (E.D.La.1969), relied upon by plaintiffs, Judge Rubin held that the officer therein had acted unlawfully in using deadly force in an attempt to apprehend the culprit. The facts of that case, while somewhat similar, in that the officer started out pursuing a car, are easily distinguishable. The driver abandoned the car and fled on foot and the pursuing officer fired directly at his person. At that time, there no longer was any danger to pedestrians or other drivers, as there had been while he was driving with the police in hot pursuit, and the death of the arrestee was not the result of bullets fired at the fleeing automobile.
“Likewise, the court found that the police had used unnecessary force in the Kyle case in shooting a shotgun blindly through an unlocked apartment door, knowing that someone was directly behind the door. The circumstances there were that the apartment exits were covered and there was little chance for the occupants to escape; they made no attack on the officers and the officers could have delayed the arrest without great risk.
“Plaintiff attempts to analogize the facts herein with those in the Kyle case arguing that the police had effectively blocked off the avenues of escape for young Smith and, therefore, there was no risk involved.
“Whether there was little chance for Smith to escape is not only a question of fact, but also a question of what the pursuing officers knew of the facts.
“Reference is made to the diagrams in evidence. Smith Street on which the deceased and all police units were traveling is an E-W street. All were travelling in a westerly direction.
“Washington Street is a N-S street.
“The boy crossed Washington at a high rate of speed followed by Durham in the lead car, another State Police car and a Deputy Sheriff.
“The West Monroe Police cars, 3 in number, turned North on Washington.
“The boy proceeded to the next intersection, West Heights Street, a gravel road, and turned right, or North, followed still by Durham and the other two cars.
“The chase then went to the next East-West street, Bethel Church Road, also gra-velled, and turned right, or back toward Washington Street. Durham and the LSP unit followed. The Sheriff’s car continued one block north to Riser School Road, an East-West Road, and turned right or back to Washington Street.
“The West Monroe units turned West onto the Riser School Road which paralleled the Bethel Church Road.
“The church faced Washington Street and occupied the block between the Bethel Church Road and the Riser School Road.
“The boy turned left into the church parking lot which was behind the church. At that time he was being pursued by two LSP units. On the Riser School Road at the North end of the parking lots was a Sheriff’s car approaching from the West and two West Monroe units approaching from the East. It was possible that he could get by those units, but not probable.
“The most probable escape route was for him to have continued to Washington Street.
“At this point arises a discrepancy in the testimony. The driver of one West Monroe unit testified that he placed his car across the Riser exit from the church parking lot. *503 No other officer saw his car there. He also disagreed with the manner in which the shots were fired.
“The Court is convinced that the only shot which hit the boy was fired as he turned into the parking lot because the path of the other shot as they creased the top of the car was at a 40 degree angle. What is inexplicable is how the boy managed to drive his car across the parking lot at sufficient speed to jump the ditch at Riser Street and into the ditch on the north side of the street.
“Because of the speed at which he was driving, concentration on the car ahead of him and the dust flying from that car, Durham was unaware of the location of the other police units.
“Thus, the situation as presented to Durham was not nearly so clear-cut as was evident in the Kyle case. He did not know, or realize, that the escape route was blocked by other police units.
“Durham’s actions in this case can be compared to those of the officer in Graham v. Ogden, 157 So.2d 365 (La.App.3rd, 1963), who, in making an arrest under difficult circumstances, drew his pistol and fired into the floor in an attempt to overcome resistance to the arrest.
“The Court believes that Durham’s actions were clearly lawful and reasonable under the circumstances. The act of shooting at the rear of the car met the test of utility to a very strong degree. It was intended to enable Trooper Durham to perform his duty to make the arrest. The foreseeable risk of harm to the car’s occupants was relatively slight.”
The judgment is therefore affirmed. All costs are to be paid by appellants.