440 So.2d 945 (1983)
Charles H. FULLERTON d/b/a Fire Sprinkler Specialties, Plaintiff-Appellee,
v.
SCARECROW CLUB, INC. d/b/a The Bleachers, Defendant-Appellant.
No. 15754-CA.
Court of Appeal of Louisiana, Second Circuit.
October 24, 1983.
*946 Charles W. Robinson, Monroe, for defendant-appellant.
Shotwell, Brown & Sperry by C.A. Martin, III, Monroe, for plaintiff-appellee.
Before MARVIN, FRED W. JONES, Jr. and SEXTON, JJ.
SEXTON, Judge.
Plaintiff, a contractor, filed suit against defendant for the amount allegedly due him under a construction contract; he prayed, in the alternative, for a quantum meruit award for work done by him which inured to defendant's benefit. The trial court granted plaintiff a quantum meruit award under the alternative demand. We reduce the trial court's award, and, as amended, affirm the trial court's judgment.
Plaintiff in this cause is Charles H. Fullerton d/b/a Fire Sprinkler Specialties (hereinafter referred to as Fullerton). Mr. Fullerton owns and operates a business in West Monroe, La., which engineers and installs fire extinguisher sprinkler systems in residential and business structures. The defendant is Scarecrow Club, Inc. d/b/a The Bleachers. The defendant is a Louisiana corporation which operates a nightclub in Monroe, popularly referred to as The Bleachers.
Fullerton and the defendant entered into a contract on November 2, 1981, in which Fullerton obligated himself to install an automated sprinkler system in The Bleachers for the sum of $6,716.00. Fullerton thereafter designed the sprinkler system for The Bleachers, and purchased the necessary materials for the installation.
Fullerton began installation on Wednesday, January 20, 1982. On that date, Fullerton and his assistant, Carl Myers, each worked approximately four hours unloading sprinkler system components and materials at The Bleachers. Fullerton and Myers then spent 28 hours apiece the following *947 week in installing the automated sprinkler system in The Bleachers. Fullerton halted work on the installation on Wednesday, January 27, to await the city's installation of the water tap that was necessary to connect The Bleachers' sprinkler system with the city's water supply; Fullerton halted installation at this time because no more work could be done on The Bleachers' sprinkler system until the city water tap was installed. It was the defendant's responsibility, under the contract of November 2, 1981, to procure and pay for the city's services in installing the city water tap. The city water tap was installed approximately two weeks after Fullerton's work stoppage, removing the last technical obstacle to Fullerton's completion of the job.
By an invoice dated January 21, 1982, the day after work began, Fullerton billed the defendant for $5,225.[1] The invoice stated that 100% of the project's engineering and system fabrication had been completed, 100% of the needed materials purchased, but none of the required installation performed. Fullerton had unloaded the sprinkler system components on the job site at that time, but had scarcely begun installation efforts.
In February of 1982, several weeks after Fullerton had stopped working on the sprinkler installation at The Bleachers, Mr. Fullerton sought out Charles Robinson, president of the defendant, and requested full payment of the invoice for $5,225. However, Mr. Robinson declined to make full payment of the invoice amount since, under his understanding of the contract's terms of payment, payment was not due until the project was substantially completed. It was Mr. Robinson's "personal observation that the [installation called for by the] contract had not been completed." Robinson instead tendered to Fullerton a payment on behalf of the defendant in the amount of $1,000 for the materials that had been installed prior to Fullerton's work stoppage on January 27, 1982. Fullerton accepted the check for $1,000. Robinson also offered at that time to place the entire balance of the contract price in an escrow account, and stipulate that the escrow account would be released to Fullerton upon completion of the sprinkler installation. However, Fullerton rejected the offered escrow arrangement.
On May 12, 1982, in a written act of sale, Fullerton sold to the defendantat a price of $1,504all of the materials which had been purchased by Fullerton for The Bleachers project, but which had not been installed by Fullerton in The Bleachers. The defendant subsequently paid Gerald Johns the sum of $3,400 to complete the sprinkler installation at The Bleachers, using the $1,504 worth of materials purchased from Fullerton. Johns testified that the $3,400 total represented approximately $1,000 for material costs, and a $2,400 charge for approximately 77 man hours of labor.
The business dealings of Fullerton and the defendant can be summarized as follows: After the parties agreed by a contract of November 2, 1981 that Fullerton would install a fire sprinkler system for the price of $6,716, Fullerton began installation on January 20, 1982. On January 21, Fullerton billed the defendant for 77% of the project's total contract price, even though construction had scarely begun. Fullerton initially discontinued installation a week later on January 27with much work left to be donebecause the absence of a city water tap precluded further installation. The city water tap was installed on about February 15.
The defendant subsequently refused to pay the January 21 invoice amount of $5,225, and instead paid Fullerton $1,000, construing the contract between the parties to mandate that payment was only due upon 95% completion of installation. Fullerton, in turn, expressly refused to finish installation at The Bleachers until the total invoice amount of $5,225 was paid. Thus, although Fullerton initially discontinued installation because of the absence of a city water tap, Fullerton thereafter refused to *948 finish installation because of the defendant's failure to pay the billed amount of $5,225. Fullerton ultimately sold to the defendant for $1,504, materials which he purchased for The Bleachers but never installed.
Plaintiff Fullerton filed suit against defendant on December 15, 1982. In his main demand, plaintiff prayed that he be awarded the entire amount owed him under the contract of November 2, 1981, less a $2,504 credit for the $1,000 payment and $1,504 materials purchase made by the defendant; the main demand thus prayed for an award of $4,332.[2] In his alternative demand, plaintiff Fullerton sought a quantum meruit award based on his labor and materials, less a $2,504 credit for the defendant's payments; the alternative demand thus prayed for $2,457.07.
The trial court granted plaintiff relief on the alternative quantum meruit demand, and thus awarded him the sum of $2,457.07, which sum supposedly reflected the value of Fullerton's labor and materials less a $2,504 credit for the defendant's previous payments. Defendant has appealed the trial court's award of $2,457.07, contending that that award is excessive. Plaintiff Fullerton has answered the appeal, seeking damages and attorney's fees on the grounds that the defendant perfected a frivolous appeal. However, there is substance to defendant's appeal, as will hereafter be made clear, and plaintiff-appellee Fullerton's damage claim for frivolous appeal is therefore dismissed. Thus, the essential issue to be resolved on this appeal is whether the award made by the trial court was excessive.
A contract constitutes the law between, and binding upon, the parties that have entered into it. LSA-C.C. 1945. The pertinent phraseology of the tersely worded contract governing this cause provides as follows:
"We [Fullerton] are pleased to furnish you with our cash price of Six Thousand Seven Hundred Sixteen and no/100 Dollars ($6,716.00) to furnish a wet type light hazard sprinkler system throughout [The Bleachers].
....
"The installation will be performed in accordance with the rules and regulations of the National Fire Protection Association (NFPA) and subject to the inspection of the Property Insurance Association of Louisiana for fire insurance rate considerations, based on the minimum requirements of NFPA.
"Our terms of payment will be net 10 days of 95% of the price of material delivered and work performed. The final 5% will be invoiced when our work is substantially completed."
The cause, object and price of the foregoing contract, as well as the parties' reciprocal obligations, are clear from the contract's literal terms: Fullerton was obligated to furnish and install a sprinkler system in The Bleachers, and the defendant was obligated to pay Fullerton $6,716 for the materials, labor and installation.
While the cause, object and price of the foregoing contract are clear, the contract's stipulated terms of payment are unclear and ambiguous. The phrase which engenders uncertainty is the contract's rather cryptic stipulation that "our terms of payment will be net 10 days of 95% of the price of material delivered and work performed."
Was payment intended to be fractionalized and separated into a materials installment and a labor installment, such that a materials installment would be due upon delivery of 95% of the materials, and a separate labor installment would be due upon completion of 95% of the required labor? Or, did the contract contemplate that a single payment of the entire contract price would be due only upon 95% completion of both materials delivery and installation? Or can it be said that the contract envisioned the payment of 95% of the price *949 of any material delivered or any work performed within ten days of billing thereof?
It is unnecessary to resolve this ambiguity.[3] Even under the interpretation most favorable to the plaintiff, it is clear that the invoice of January 21, 1982 was substantially in excess of the terms of the contract.
Under any interpretation plaintiff could only invoice for the materials actually on the site. Fullerton's testimony was that when he left the job he had $2,000 worth of materials installed. As we have indicated this date was approximately a week after the defendant was billed. Obviously, on the day of billing substantially less than $2,000 was installed. However, for the purposes of this analysis of the validity of plaintiff's bill, we will assume that plaintiff had $2,000 worth of materials actually on the site.[4] Since the plaintiff testified that he billed for 100% of materials and since the defendant later paid the plaintiff $1,504 for the materials at plaintiff's shop, it is apparent that the total material cost was $3,504. Recall that plaintiff testified that the invoice included 100% of "materials, engineering and fabrication" less 5%making the total cost $5,500. Subtracting the material cost of $3,504, the remaining costs amount to $1,996. Adding the $2,000 worth of materials to this sum equals $3,996; 95% thereof is $3,796.20. Therefore, plaintiff's invoice of $5,225 was, even under the interpretation of the contract and evidence most favorable to the plaintiff, substantially excessive.
Therefore, the defendant did not breach its contractual obligations by refusing to make full payment of the January 21, 1982 invoice for $5,225.
While the defendant did not breach its contractual obligation, under the construction of that contract that we have adopted, we find that Fullerton did breach his contractual obligation. Simply stated, Fullerton had an obligation to completely install an automated sprinkler system in The Bleachers, and breached this obligation by failing to complete the required installation. Fullerton's non-performance is not legally excused by the fact that the defendant withheld payment of an invoice not in accordance with the terms of the contract.
Since plaintiff Fullerton has not performed his contractual obligation, he may not place the defendant in default and obtain contractual damages. LSA-C.C. Arts. 1912, 1913. See also, Bouterie v. Carre, 6 So.2d 218 (Orl.App.1942). Moreover, because the defendant has not breached the contract or indicated an intent to do so, Fullerton may not avail himself of the doctrine of anticipatory breach to seek remedies in contract against the breaching party while withholding his own performance. See Comment, The Doctrine of Anticipatory Breach of Contract, 20 La.L.Rev. 119 (1959). Thus, since Fullerton has breached the contract and the defendant has not, Fullerton may not seek contractual damages, or specific enforcement of the contractual provision obligating the defendant to pay him $6,716.
However, while Fullerton is thus not entitled to an action in contract, he does have an action in quasi-contract under the theory of quantum meruit since his work rebounded to defendant's benefit. Quantum meruit is a common law doctrine which has been jurisprudentially adopted in this civilian jurisdiction; quantum meruit is most often viewed as a codally unenumerated quasi-contract. Comment, Quantum Meruit in Louisiana, 50 Tul.L.Rev. 631 (1976). The doctrine of quantum meruit provides a civil remedy where equity demands recovery, and neither tort or contract provides a legal basis therefore. Quantum meruit is appropriate where defendant is enriched by plaintiff's time, talent, labor and materials, or where plaintiff's efforts inure to defendant's *950 benefit, under such circumstances as imply an obligation to pay for the service thus rendered by plaintiff. Alexis v. Pacaccio, 410 So.2d 867 (La.App. 4th Cir.1982); Baron v. Peter, 286 So.2d 480 (La.App. 1st Cir.1973); Bouterie v. Carre, supra; Granger v. Fontenot, 3 So.2d 215 (La.App. 1st Cir.1941).
The statutory basis most often ascribed to quantum meruit recovery are Civil Code Articles 1965, 2292, 2293 and 2294, defining equity and quasi-contracts. Villars v. Edwards, 412 So.2d 122 (La.App. 1st Cir.1982); Skains v. White, 391 So.2d 1327 (La.App. 2d Cir.1980); Broussard, Broussard & Moresi, Ltd. v. State Auto & Casualty Underwriters Co., 287 So.2d 544 (La.App. 3d Cir.1973); O.J. Ward, Inc. v. Winford Co., 254 So.2d 152 (La.App. 2d Cir.1971).
The jurisprudence has adopted several different approaches for determining quantum meruit awards; however, these methods are not mutually exclusive, and their application to the same factual issue often yields closely similar if not identical results. Quantum meruit awards have been determined according to the value of plaintiff's efforts to the defendant. See, Quantum Meruit in Louisiana, supra, at 647. It has been stated that where a contract price has been agreed upon, quantum meruit recovery has been computed according to the contract price less any amount necessary to complete, finish or perfect the plaintiff's work. Bouterie, supra. Quantum meruit recovery has also been awarded on the basis of the cost to plaintiff of his labor and material. O.J. Ward, Inc., supra. Quantum meruit has been determined according to an interrelated complex of considerations, including the extent and skill of the work performed; defects and incompleteness therein; the labor and money necessary to complete and perfect plaintiff's work; and the value and benefit defendant has received from plaintiff's work. Bouterie, supra. Despite earlier jurisprudence to the contrary,[5] recent decisions have allowed quantum meruit recovery for profit and/or overhead expense attributable to the project. Skains, supra; Villars, supra.
Perhaps the most astute basis for determining quantum meruit awards was articulated in Jones v. City of Lake Charles, 295 So.2d 914, 917 (La.App. 3d Cir.1974), wherein the court acknowledged that there is no mathematical formula for computing quantum meruit awards:
"The general rule is that the plaintiff who establishes his right to be compensated on quantum meruit should recover as much as he reasonably deserves for his services and for the time and labor required for them. There is no specific test which must be applied to determine the reasonable value of such services. It is a matter of equity depending upon the circumstances of each case."
Guided by this expression of quantum meruit recovery, we determine that plaintiff was entitled to a judgment of $1,700.
It should be noted that Fullerton made the unsubstantiated assertion at trial that he had installed $2,000 worth of materials at The Bleachers. However, this claim was not proven with the requisite degree of evidentiary specificity, since it was constituted by a bare, unsupported assertion. See Cloney v. Travelers Ins. Co., 253 So.2d 83 (La.App. 1st Cir.1971). Moreover, the claim that $2,000 worth of materials was installed by Fullerton contravenes the other evidence adduced, while the notion that only $1,000 worth of materials was installed is entirely consistent with the documentary evidence. Fullerton introduced invoice vouchers which purportedly represented the entire amount of materials purchases made by him for The Bleachers job including both the materials installed by him and materials not installed by him. Invoices show that the total amount of the purchases was approximately $2,500, which should include fabrication costs of the plaintiff. Since $1,500 worth of materials not utilized by Fullerton when he stopped work were purchased by the defendant, this leaves $1,000 worth of materials purchased for the job *951 which were installed. Thus, the defendant's initial payment of $1,000 and the subsequent purchase of materials not installed by Fullerton entirely compensated Fullerton prior to trial for materials supplied.
Remaining to be considered are the blueprints which Fullerton testified were a $400 cost item to him and the approximately $700 which he testified was his out-of-pocket labor expense at the time he left the job. It thus becomes our task to assess an overhead and profit factor for these items, as well as for the $1,000 worth of materials the evidence indicates was in the project at the time that Fullerton ceased work. We believe it inappropriate to consider a profit and overhead factor for the $1,500 worth of materials and sold directly to defendant subsequent to the termination of work. We will award $600 as profit and overhead, which is approximately 30% of the cost to plaintiff of the $2,100 worth of labor, designs and installed materials. Since plaintiff has been paid for materials, he is thus entitled to judgment for the $700 labor cost, $400 blueprint cost, and $600 profit and overhead, for a total of $1,700. In summary, plaintiff-appellee Fullerton has received $2,504 from the defendant prior to trial which compensates plaintiff for his material cost. The trial court awarded Fullerton, in addition to this sum, $2,457.07 in quantum meruit. For the reasons aforesaid, we amend that quantum meruit award from $2,457.07 to $1,700.00.
There will therefore be judgment herein rejecting plaintiff-appellee's demands on the basis of frivolous appeal. The trial court judgment of $2,457.07 in favor of plaintiff and against the defendant is amended to the sum of $1,700.00, and as amended, is affirmed. The costs of this appeal are assessed equally to both parties.
AMENDED AND AFFIRMED.
NOTES
[1] 95% of the $5,550 worth of work plaintiff contended was completed at that point.
[2] The $2,504 worth of payments attributed to the defendant were not credited to the original contract price of $6,716, but to a revised contract price of $6,836, which reflected minor additions and modifications to the original contract.
[3] Of course, any ambiguity is to be construed against the drafter. LSA-C.C. Art. 1958.
[4] We make this assumption for the purpose of this immediate analysis of plaintiff's bill only. As we discuss infra, we believe the evidence shows that the actual price of materials plaintiff had at the site was $1,000.
[5] O.J. Ward, Inc. v. Winford Co., 254 So.2d 152 (La.App. 2d Cir.1971).